No. 45,723

KANSAS FARM BUREAU INSURANCE COMPANY, INC., *Appellee,*
v. HAROLD L. COOL, *Appellant.*

(471 P. 2d 352)

Opinion filed June 13, 1970.

*Bradley Post,* of Michaud and Cranmer, of Wichita, argued the cause, and *Orval L. Fisher* and *Gerald L. Michaud,* of the same firm, were with him on the brief for the appellant.

*Robert L. Howard,* of Foulston, Siefkin, Powers and Eberhardt, of Wichita, argued the cause, and *Robert C. Foulston,* of the same firm, was with him on the brief for the appellee.

The opinion of the court was delivered by

SCHROEDER, J.: The ultimate question to be resolved by this appeal is whether a motor vehicle described as a "dune buggy" is "an automobile" within the meaning of the uninsured motorists provisions of an insurance policy.

The case arises out of a written contract of insurance between the parties and involves primarily questions of law which stem from facts that are not basically in dispute.

On the 2nd day of February, 1966, the Farm Bureau Insurance Company, Inc. (plaintiff-appellee) issued its family combination automobile policy to Harold L. Cool (defendant-appellant). The policy was in effect on April 1, 1967, when the accident in question occurred. The policy was written on two automobiles owned by the appellant, a 1959 Cadillac 4-door hardtop and a 1954 Ford one-half ton pickup. Uninsured motorists coverage was provided on each automobile, the premium being $3.60 on the Cadillac, but only $2.70 on the Ford pickup. The policy contained an "other insurance" clause applicable to the uninsured motorists coverages in the event an insured was injured while occupying a non-owned automobile.

On the 1st day of April, 1967, Cool was injured in an accident while riding as a fee-paying passenger in a vehicle referred to as a "dune buggy," which was being driven across the sand dunes of the Little Sahara State Park near Waynoka, Oklahoma. Cool had paid fifty cents to the owner of the dune buggy, Elden Shirley, to take him for a ride over the sand dunes. The ride was described by Cool as "an amusement-type ride" and also as a sightseeing ride. The ride on which the accident occurred was Cool's third trip over the sand dunes on the day in question. Various witnesses, who also operated a dune buggy for hire in the park, described the ride as "both a sight-seeing tour and a thrill ride," and as "an amusement or thrill ride." Shirley stated one could hardly keep from having a thrill, that the ride was only for personal amusement.

Cool made a claim under the uninsured motorists provisions of his policy against Farm Bureau, and before Farm Bureau denied the claim Cool made demand for arbitration.

Farm Bureau then instituted the instant action for declaratory judgment to determine the coverage of the policy and to enjoin Cool from proceeding with arbitration. The matter was then tried in Sedgwick County before the Honorable John A. Potucek, an assigned judge, on April 23, 1968.

Elden Shirley had purchased the dune buggy from his brother-in-law, Howard Young of Waynoka, Oklahoma, less than thirty days prior to the accident. Young had previously purchased it in the spring of 1966 from Howard Dannar of Topeka, Kansas, who had bought it from its original owner and builder, Dean Johnson of Waynoka, Oklahoma.

The deposition testimony of Young and Shirley, admitted into evidence, and the testimony of Howard Dannar established the construction, use and inherent characteristics of the dune buggy upon which the trial court based its findings and conclusions. The basic chassis was taken from an old three-quarter ton truck, the motor was an old Chevrolet motor, and the transmission was from a Chevrolet truck. It was open and unenclosed and the doors, sides and top had been removed. It was not equipped with a windshield; it had no headlights or taillights; it had no horn; it had no fenders on the front and tractor fenders had been mounted on the rear; there was no properly functioning speedometer or gas gauge; there was no hood or cowling over the motor; the front and rear axles had been moved forward about forty inches in order to put all the weight on the back wheels so the front wheels would not bury in the sand; a tractor gas tank had been mounted in front of the radiator; a heavy bar or piece of railroad rail about eight feet long and weighing ten to fifteen pounds per foot had been welded across the back where the frame had been cut off; large 1600 x 16 airplane bomber low pressure (5-7 psi) balloon tires had been placed on the back wheels; the springs had been removed between the rear axle and the frame; and a sign on the rear of the dune buggy stated, "Not responsible for accidents."

Howard Dannar testified he knew of his own personal knowledge that the dune buggy was not designed for, nor was it principally used for operation upon the highways, but rather was designed and built for use on the sand dunes at the park.

Elden Shirley, the owner and operator at the time of the accident,

testified he considered it to be an off-the-road vehicle, and that no one would want to drive it on the highway because it was actually "no highway vehicle."

The dune buggy was kept on the Waynoka, Oklahoma, farm of Howard Young, the person from whom it had been purchased by Elden Shirley less than thirty days prior to the accident. Young was permitted to use it any time he wanted. He used it principally off the road as a utility vehicle around his farm. He did not use it for a highway vehicle. He had used it to pull tractors, build fence, hunt, pull a harrow and a drill, and feed cows with it.

On the day of the accident the dune buggy was not driven to the Little Sahara State Park by Young or Shirley, but was towed behind Young's pickup. It had been driven on the public roads only occasionally for short distances, and all the rest of the time it was driven in the sand dunes, on the farm or in the fields.

There is no motor vehicle certificate of title to the dune buggy in question. All transfers of ownership from its original owner, Dean Johnson, to its present owner, Elden Shirley, have been made without an assignment or the transfer of a title certificate of any kind.

The dune buggy was never licensed or registered as an automobile or highway vehicle with the state of Oklahoma by any of its owners. Howard Dannar had tried to obtain a license but was told there was no way of tagging the vehicle.

The dune buggy was not equipped as required by the statutes of Oklahoma for use on the highways of the state.

Various types of dune buggies were operated in the Little Sahara State Park by a number of persons. In order to operate a dune buggy for hire lawfully in the park, a license or permit was required by the Oklahoma State Industrial and Development Council. To obtain such permit an applicant was required to carry special public liability insurance on the dune buggy while being operated in the park, and to pay ten percent of the fees collected to the state of Oklahoma. Elden Shirley, who was operating the dune buggy in question at the time of the accident, had not obtained a permit from the state of Oklahoma and did not carry a policy of insurance specifically written on his dune buggy. Howard Young, the prior owner, had inquired about insuring this particular dune buggy, but was told by his insurance agent that it could not be insured. Other dune buggy owners testified that a special policy with an extra high premium was required to insure a dune buggy,

and that liability insurance alone would cost from $175 to $250 per year.

The trial court held the uninsured motorists provisions of the policy of insurance issued by Farm Bureau did not apply to cover the accident in question. The trial court, among the reasons given, stated the dune buggy in which Cool was riding was not "an automobile" within the meaning of the uninsured motorists provisions; and the dune buggy was "equipment designed for use principally off public roads" and came within the provision of the policy excluding such equipment from uninsured automobile coverage. Accordingly, a declaratory judgment was entered in favor of Farm Bureau and a permanent injunction issued restraining and enjoining Cool from further proceeding with the arbitration proceedings instituted by him.

Protection against uninsured motorists is covered in Part IV of Cool's Farm Bureau policy. Including the caption it reads in material part as follows:

"PART IV—PROTECTION AGAINST UNINSURED MOTORISTS

"THIS FORM PROTECTS INSUREDS WHO ARE NOT CONTRIBUTORILY NEGLIGENT AGAINST BODILY INJURY CAUSED BY NEGLIGENT UNINSURED AND HIT-AND-RUN MOTORISTS.

"Coverage J—Uninsured Motorists (Damages for Bodily Injury.) To pay all sums which the insured or his legal representative shall be legally entitled to recover as damages from the owner or operator of an uninsured automobile because of bodily injury, sickness or disease, including death resulting therefrom, hereinafter called 'bodily injury,' sustained by the insured, caused by accident and arising out of the ownership, maintenance or use of such uninsured automobile; provided, for the purposes of this coverage, determination as to whether the insured or such representative is legally entitled to recover such damages, and if so the amount thereof, shall be made by agreement between the insured or such representative and the company or, if they fail to agree, by arbitration."

Part IV of the policy then further defines an "uninsured automobile" as including a trailer of any type and means: an automobile or trailer with respect to the ownership, maintenance or use of which there is no bodily injury liability bond or insurance policy applicable at least in the amount specified by the financial responsibility law or a hit-and-run automobile. The policy then provides:

"but the term 'uninsured automobile' shall not include:

. . . . . . . . . . . . .

"(5) a farm type tractor or equipment designed for use principally off public roads, except while actually upon public roads."

In Part I of the policy the insurance company excluded liability for bodily injury or property damage arising out of the operation of farm machinery.

The rules for construing insurance contracts have been enumerated many times by this court.

Although ambiguities in the wording of an insurance contract are to be construed in favor of the insured, this rule of construction has no application whatever to language that is clear in its meaning. Unless a contrary intention is shown, words used in an insurance contract are to be given the natural and ordinary meaning they convey to the ordinary mind. The language of a policy of insurance, like any other contract, must, if possible, be construed in such manner as to give effect to the intention of the parties at the time it was made as expressed therein. (*Kendall Plumbing, Inc. v. St. Paul Mercury Ins. Co.*, 189 Kan. 528, 532, 370 P. 2d 396.)

In determining the intention of the parties under the above rule the test is not what the insurer intended the words of the policy to mean, but what a reasonable person in the position of the insured would have understood them to mean. (*Braly v. Commercial Casualty Ins. Co.*, 170 Kan. 531, 227 P. 2d 571.)

Ambiguity in a written instrument does not appear until the application of pertinent rules of interpretation to the face of the instrument leaves it genuinely uncertain which one of two or more meanings is the proper meaning. (*Simonich, Executrix v. Wilt*, 197 Kan. 417, 423, 417 P. 2d 139.)

The Tenth Circuit Court of Appeals in *Thomas v. Continental Casualty Company*, 225 F. 2d 798 (10th Cir. 1955), said:

". . . All ambiguities will be resolved against the insurer, but the insured is charged with the plain ordinary meaning of inartistic words, and we will not torture words to import ambiguity where ordinary meaning leaves no room for such. . . . Words do not become ambiguous simply because lawyers or laymen contend for different meanings, or even though their construction becomes the subject matter of litigation." (p. 801.)

In *Ferguson v. Phoenix Assurance Co.*, 189 Kan. 459, 370 P. 2d 379, 99 A. L. R. 2d 118, this court said:

"It is a generally accepted rule that insurance policies are to be construed in favor of the insured and against the company. This rule, however, is to be invoked only where there exists rational grounds for construction of the policy. That is, the contract must contain provisions or language of doubtful, ambiguous or conflicting meaning, as gathered from a natural interpretation of its language. . . . If the language when given its everyday commonly accepted meaning is clear and specific in presenting the subject matter at hand, the objective to be accomplished, the burdens assumed, and the benefits to be enjoyed or re-

ceived, then the terms of the policy cannot be said to be doubtful of meaning or conflicting in terms. Under these circumstances, courts are not at liberty to indulge in a construction that would give an unnatural meaning to the language in order to accomplish results that could not be shown to have been in the minds of the parties. . . .

"Where an insurance contract is not ambiguous, the court may not make another contract for the parties. Its function is to enforce the contract as made. . . ." (p. 463.)

While the parties to this action concede the foregoing rules, their application of these rules to the instant case leads to divergent conclusions. The insurance company contends the dune buggy in question is not an automobile within the meaning of that term as used in the policy of insurance, and the insured contends it is an automobile within the meaning of the policy.

The uninsured motorists provisions of an insurance policy were before this court recently in *Sturdy v. Allied Mutual Ins. Co.*, 203 Kan. 783, 457 P. 2d 34. There it was said the uninsured motorists protection follows a person whether he is a passenger or a pedestrian. The insured here relies upon this proposition, but he overlooks the fact that to have *any* uninsured motorist coverage at all, one must have been injured by an uninsured automobile within the meaning of the policy of insurance.

The insured analyzes the various provisions of the policy and concludes that the term "automobile" as used in the policy here in question is an imprecise term. To illustrate this point he says:

". . . Presumably, the term 'uninsured automobile' as used in the policy would have included 'a land motor vehicle or trailer if operated on rails or crawler treads, or while located for use as a residence or premises and not as a vehicle, or . . . a farm type tractor or equipment designed for use principally off public roads except while actually upon public roads. . . .' had such vehicles not been withdrawn from the policy by its terms. The insurance company, which prepared the insurance contract, could have, but did not exclude the automobile which had been modified from a pickup truck in which the appellant was a paying passenger at the time he was injured."

The insurance company, on the other hand, resorts to the definition of an automobile in Webster's Third New International Dictionary, Unabridged, which defines an automobile as a four-wheeled automotive vehicle designed for passenger transportation *on streets and roadways*, etc. It also relies upon a similar definition in The Random House Dictionary of the English Language, 1966 edition. Based upon such definitions it is argued the term "automobile," as used in the policy, does not cover the dune buggy here in question

because it was not designed for passenger transportation *on streets and roadways.*

As a generic word, "automobile" is broad enough to include all forms of self-propelling vehicles. However, the word is to be defined in a particular case from its association in the context and by considering the object or purpose of the instrument in which it is used. The manner in which a vehicle is used, as well as its construction, is an important factor in determining its character. (*Washington Nat. Ins. Co. v. Burke,* 258 S. W. 2d 709 (Ky. 1953); and *Poncino v. Sierra Nevada L. & C. Co.,* 104 Cal. App. 671, 286 Pac. 729.)

In *Williams v. Standard Accident Ins. Co.,* 158 C. A. 2d 506, 322 P. 2d 1026, the court said:

" '. . . Automobile is general name adopted by popular approval of all forms of self-propelling vehicles for use on highways and streets, and is presumed to have been used in indemnity provision of accident policy in its common, general, and popular sense, in absence of proof to the contrary. . . .' " (p. 510.)

It would be improper to isolate Coverage J in Part IV of the policy and determine the meaning of the term "automobile" as used in the policy solely from this language. All uninsured motorists provisions should be considered in the light of the subject matter with which the parties are dealing and the purpose to be accomplished, and the language used must be given its ordinary and commonly accepted meaning. (*Mittelsteadt v. Bovee,* 9 Wis. (2d) 44, 100 N. W. 2d 376.) In this connection language in the exclusions is significant.

In applying the foregoing factors to the present case, the intention expressed in the policy is that the uninsured automobile covered by the policy is a motor vehicle that is designed for or used on a public roadway.

Application of the foregoing factors to the present case clearly shows that the dune buggy was not within the generally accepted or ordinary meaning of the term "automobile." It was not thought of as an automobile by those who owned it. It was sold by all successive owners without automobile title certificates of any kind. It was not suitable or safe for use on highways and streets. It was not designed for use on public roads, but was designed and intended for use on the rolling sand dunes of the Little Sahara State Park. It was used only for giving thrill and amusement rides across the sand dunes or occasional farm work and hunting. It was never

used principally to transport persons on any public roads or highways. The risk involved in riding in the dune buggy was much greater than while riding in an automobile. The safety equipment normally found on an automobile was totally lacking on the dune buggy. There were no bumpers, no rear springs, no doors or sides, no roof, no mirror, no horn, and no headlights or taillights. The dune buggy was not and could not have been licensed or registered as an automobile with the state of Oklahoma for use on highways and streets because it did not have the required safety equipment.

Exclusion (5) in Part IV of the policy, heretofore quoted, is subject to the same interpretation. That is, the dune buggy in question is "equipment designed for use principally off public roads," and it was not actually being used upon the public roads when the accident occurred. It was therefore *excluded* from coverage as an uninsured automobile.

On this point the insured argues the word "equipment" following the conjunction "or" in Exclusion (5) relates back to the descriptive words "farm type." He seeks to buttress this argument by the exclusion under Part I of the policy which is designed to exclude liability for bodily injury arising out of the operation of farm machinery. His argument then proceeds on the assumption that the dune buggy is not "farm type" equipment.

A resort to the decided cases on the point, however, does not confirm the insured's position.

In *Beagle v. Automobile Club Ins. Co.*, 18 OO (2d) 280, 176 N. E. 2d 542, the question presented was whether a modified stock car used for racing was "other equipment designed for use principally off public roads." The court held it was. There the plaintiff was injured at a race track when a wheel on one of the modified stock car racers came off and struck him. The court held the insurance company was not obligated to pay the plaintiff's medical expense under the medical payments portion of the policy issued to the plaintiff, because the plaintiff was not injured by an automobile within the meaning of the policy. The language describing the modifications made to the automobile in that case to equip it for racing in the modified stock car races resembles in many respects the description of the dune buggy in the instant case. In the opinion the court said:

". . . the testimony shows that although it had a speedometer the cable was not attached and that big tires had been put on the wheels. Furthermore, the car was not licensed for the year 1957 to travel on the roads

and highways and in the court's mind the fact it could be driven on the highway, even though illegal, does not change the fact that the vehicle had been designed for racing purposes. In fact, it was carried to and from the track on a trailer and not under its own motive power.

". . . is it other equipment designed for use principally off public roads? The court thinks it is.

"Equipment has been variously defined to include accessories but it may also mean the main vehicle itself. . . . In the racing of automobiles, the automobile is part of the equipment for that dangerous business.

". . . This auto racer was designed principally for use off the public road, and therefore is not an automobile within the meaning of the definition in the policy." (p. 281.)

On similar facts the same result was reached in *Williams v. Cimarron Insurance Company*, 400 S. W. 2d 805 (Tex. Civ. App. 1966), affirmed 406 S. W. 2d 173. In the opinion the court there said:

". . . These statutes require automobiles which operate on public highways to be equipped with such safety equipment as horns, tail and head lights, signalling equipment, etc. The vehicle was completely lacking in the basic required equipment to permit it to be operated on public roads and highways. In view of the holding of the Beagle case, together with these additional facts, we conclude that the vehicle in question was designed 'principally for use off public roads' and that, therefore, is not an automobile within the meaning of the policy." (p. 808.)

The dune buggy in the instant case, like the modified stock car racers in the cases just cited, clearly was designed for use off public roads. Like the racers it is not an automobile within the meaning of the policy, but is "equipment designed for use principally off public roads" and is excluded from coverage.

The insured's contention that the rule *ejusdem generis,* thereby causing the exclusion to apply to farm type equipment only, is erroneous. In other cases where the same argument has been made the courts have refused to apply the *ejusdem generis* rule to the type of clause involved in the appellant's insurance policy. (*Livingston v. Nationwide Mutual Insurance Company*, 295 F. Supp. 1122 [D. S. C. 1969]; *Beagle v. Automobile Club Ins. Co.,* supra; and *Williams v. Cimarron Insurance Company,* supra.) Both the *Beagle* and *Williams* cases specifically considered and rejected the application of the rule to the exclusions in those policies. In rejecting the insured's theory the court in *Beagle* said:

"The rule ejusdem generis is that when general words follow an enumeration of particular cases, such general words are held to apply to cases of the same kind as those which are expressly mentioned. In the first place if the exception was just the words 'a farm type tractor or other equipment' there would be some substance to this claim, but the language is not general but

specifies that such equipment be designed for use principally off public roads. That, in effect is true also of farm tractors—they are designed for use principally on the farm and not on the highways. The court feels this exception is not ambiguous and means just what it says. This auto racer was designed principally for use off the public road, and therefore is not an automobile within the meaning of the definition in the policy." (p. 281.)

and the Texas Supreme Court, in reviewing the Court of Civil Appeals in the *Williams* case, said:

"We are unable to agree with petitioner's argument [ejusdem generis]. To us, the restrictive proviso designates two distinct classifications. It plainly states that the word automobile does not mean 'a farm type tractor or other equipment designed for use principally off public roads'. The phrase 'designed for use principally off public roads' does not convey the notion that something similar to a farm type tractor was intended by the contracting parties. . . ." (p. 175.)

The insured attempts to distinguish the *Beagle* and *Williams* decisions on the ground that the clause in each of those cases used the word "other" preceding the word "equipment." The clause in his Farm Bureau policy does not contain the word "other." It is argued the absence of the word "other" in the instant policy suggests that the words "farm type" must be understood to modify the term "equipment" as well as the word "tractor." We fail to see merit in this argument.

In *Livingston v. Nationwide Mutual Insurance Company,* supra, the exclusionary clause did not contain the word "other," and the court held the exclusion applied. There the policy was held not to cover a vehicle used solely for racing purposes which was transported from track to track by use of a trailer.

In conclusion we hold the injury sustained by the insured as a result of an accident, while riding in the dune buggy here in question, was not covered by the uninsured motorists provisions of his Farm Bureau insurance policy.

The judgment of the lower court is affirmed.