(300 P.3d 1113)
No. 108,390

GOLD MINE INVESTMENTS, INC., d/b/a GOLD REALTY, *Appellant*, v. MOUNT VERNON FIRE INSURANCE COMPANY and MED JAMES, INC., *Appellees*.

Opinion filed April 19, 2013.

*Jeffery A. Sutton*, of Sutton Law Firm, LLC, of Basehor, for appellant.

*Brian T. Goldstein* and *Nathan T. Jackson*, of Waldeck, Goldstein & Patterson, P.A., of Prairie Village, for appellee Mount Vernon Fire Insurance Company.

Before MCANANY, P.J., HILL and LEBEN, JJ.

MCANANY, J.: In this appeal we are asked to apply a requirement in a "Protective Safeguards" endorsement to a fire insurance policy that "All Electric is on Functioning and Operational Circuit Breakers."

Mount Vernon Fire Insurance Company (Mount Vernon) issued the policy that contained this endorsement to Gold Mine Investments, Inc., doing business as Gold Realty (Gold) for fire coverage on a commercial building Gold owned in Atchison. The building was destroyed by fire, and Mount Vernon denied coverage, claiming that Gold breached the policy by having both a fuse box and circuit breakers protecting the electrical service in the building.

According to Mount Vernon, the building's electrical circuits had to be protected by circuit breakers to the exclusion of any fuses.

Gold sued Mount Vernon for its denial of coverage, and the district court granted summary judgment in favor of Mount Vernon on Gold's claims. In our de novo review we conclude that Mount Vernon was not entitled to summary judgment, so we reverse the judgment in its favor and remand the case for further proceedings in the district court.

## The Policy

The policy Mount Vernon issued to Gold was a commercial package policy which included general liability and commercial property coverage for Gold's building. The commercial property coverage portion of the policy was subject to a "Protective Safeguards" endorsement which required the insured to maintain certain protective safeguards listed on a schedule. The schedule included the following: "All Electric is on Functioning and Operational Circuit Breakers." Further, the endorsement stated:

"We will not pay for loss or damage caused by or resulting from fire if, prior to the fire, you:

"1. Knew of any suspension or impairment in any protective safeguard listed in the Schedule above and failed to notify us of that fact; or

"2. Failed to maintain any protective safeguard listed in the Schedule above, and over which you had control, in complete working order."

## Mount Vernon's Summary Judgment Motion

The district court denied Mount Vernon's first summary judgment motion, finding unresolved issues of material fact for trial. Later, Mount Vernon filed the current summary judgment motion. In support of this motion, Mount Vernon stated that the "record establishes that Gold Realty failed to comply with the Endorsement because the building's electrical system at the time of the fire used both fuses and circuit breakers." Here, in abbreviated form, are Mount Vernon's key claimed uncontroverted facts:

8. Before the fire the building "did not have all electric power on functioning and operational circuit breakers."

12. The fuse panel "remained energized after Mr. Ochoa finished his work."

15. There was a three-phase fuse box in the building just before the fire.

19. The building had at least one fuse panel installed which was connected to the power source and energized with electricity.

20. The building had at least one fuse panel that was installed and operational before the fire.

21. The building had one or more fuses energized with power that were in operation right before the fire.

22. Power to the building was distributed through a disconnect switch, a fuse panel, and a circuit breaker before the fire.

23. The fuse panel was not "fully terminated" at the time of the fire.

24. The building used both fuses and circuit breakers to provide electrical power before the fire.

The citations from the record in support of Mount Vernon's motion included the depositions of Jason Ochoa and Jake Hawk, the sworn statement of Dedtrick Haley taken by Mount Vernon, and affidavits of Karen Gorski and Eric Drews.

### Ochoa's and Hawk's Depositions

Ochoa, referred to in uncontroverted fact 12, was the electrician who installed a walk-in cooler on the premises a couple of years before the fire. Mount Vernon cited Ochoa's deposition testimony that when he did the work, there was a fuse panel, circuit panel, and distribution panel from which the building's electricity operated. Ochoa said the fuses were still energized when he finished his work on the cooler.

Mount Vernon's reference to the Hawk deposition is unclear. In the cited reference Hawk agreed that "it is possible for someone to run a circuit box and a fuse box in a parallel or series."

### Haley's Sworn Statement

Haley, Gold's representative, said that the electrical service in the building remained unchanged during the time Gold owned the building and that the circuit breakers in the building were working, to the best of his knowledge. Haley said there were occasions when he had to change out fuses in the building.

## Gorski's and Drews' Affidavits

Gorski, an underwriter for Mount Vernon, stated that an energized fuse panel would constitute an increased risk of fire and a violation of the endorsement to the policy.

Drews, a mechanical engineer, stated that fuses create a greater fire risk than circuit breakers because fuses can be tampered with so as to overcome the protection they afford and fuses deteriorate with age. Further, if a fuse on a circuit trips but the downstream circuit breaker does not, there is an increased risk of fire. In Drews' opinion, having an electrical circuit protected by both fuses and circuit breakers increases the risk of fire.

## Gold's Response to the Summary Judgment Motion

Gold filed its response to the motion several days late. Though the district court expressed its displeasure with Gold's late filing, in ruling on the motion the court stated: "The Court finds that it is not necessary to grant summary judgment based upon the uncontroverted facts as a result of the plaintiff's failure to respond within the 21 day period. This matter is ripe for summary judgment based upon the evidence presented." The district court then discussed Gold's response and its references to the depositions of Hawk and Ochoa in support of its argument. Thus, it appears that the court took into account Gold's references to additional facts, though it ultimately found that they failed to create a genuine issue of material fact which would preclude summary judgment. While on appeal we consider Mount Vernon's motion de novo, we defer to the district court on whether facts asserted in the nonmoving party's response should be considered or rejected out of hand for being untimely. Because it appears that the district court considered (but ultimately found unpersuasive) Gold's additional citations to the record, we will likewise consider them in our de novo review.

## Haley's Affidavit

Gold provided an affidavit from Haley, who applied for the insurance on behalf of Gold. He stated that when he applied for the

coverage he was not asked any questions about the condition of the building's electrical system.

### Hawk's and Ochoa's Depositions

Gold cited additional testimony from Hawk's deposition. Hawks, who examined the scene after the fire, was of the opinion that because of the absence of necessary wiring, the fuses in the fuse box did not appear to have been energized at the time of the fire and the fuse box was being used simply as a junction box.

Gold cited testimony from Ochoa's deposition, the same deposition cited by Mount Vernon. Mount Vernon cited Ochoa's statement that the fuses were still energized when he finished his work on the cooler. Gold cited later testimony in the same deposition: "Q. Were there any wires energizing any of the fuse holders in that fuse box? A. No, sir. Q. No doubt in your mind? A. No, sir."

### Hawk's Affidavit

Gold also cited an affidavit from Hawk in which he stated that when he examined the electrical service in the building, the panel covers were removed and he could see that

"[a]ll of the fuse panel circuits had the wires either cut or removed. The functioning wires that entered into the fuse panel were wired nutted to an extension wire, were routed through the gutter tray and into breaker protected circuits within the circuit breaker panel.

. . . .

"All of the circuits in [the] building start at the panel box, run through a breaker and to an electrical device."

### Mount Vernon's Reply

Mount Vernon filed its reply brief. To counter Haley's affidavit, Mount Vernon referred generally to the policy application in which it claimed that Haley "expressly warrant[ed] certain conditions of the building—including that 'all electric is on functioning and operational circuit breakers.'" The policy application we examined is not the clearest of copies and we may have missed it, but we fail to see where over Haley's signature he made any such representation.

Citing *Watkins v. McAllister*, 30 Kan. App. 2d 1255, 59 P.3d 1021 (2002), Mount Vernon argued that the court should disregard

Hawk's affidavit because in it he attempts to recant testimony he gave in his sworn deposition. In support of this argument, Mount Vernon cited portions of Hawk's deposition which are not in the record but were attached to Mount Vernon's appellate brief. Consequently, we disregard such references. See Supreme Court Rule 6.03(b) (2012 Kan. Ct. R. Annot. 43); *Edwards v. Anderson Engineering, Inc.*, 284 Kan. 892, 895, 166 P.3d 1047 (2007) (stating that an appendix is limited to containing extracts from the record on appeal and cannot serve as a substitute for the record itself).

But in reviewing the portions of Hawk's deposition contained in the record and cited by Gold in its response to the motion (without the benefit of the photo exhibits referred to in the deposition), we see that Hawk testified that there were no wires leading from the outbound side of the fuse box and, more importantly, there were no wires on the inbound side of the box. There was wiring in the box, but it was "[n]ot coming out of the fuses. There was wiring in the fuse box because they used it as a junction box. . . . [T]here were no service wires into the lugs. . . . That would have been how they would have fed the fuse box." When asked whether those wires could have been burned up in the fire, Hawks stated, "They were gone. They are big. They are very big. They wouldn't have burned completely up."

*Standards of Review*

Our standards for reviewing on appeal an order granting summary judgment are the same standards the district court must apply in the first instance in considering a summary judgment motion. Those standards are well known to the parties and nearly every reader who may stumble upon this opinion. For those who need a refresher, they can be found in *O'Brien v. Leegin Creative Leather Products, Inc.*, 294 Kan. 318, 330, 277 P.3d 1062 (2012).

Because our review is de novo, we focus on the motion itself and the later response and reply, together with the citations to the record, upon which we must determine whether there remains any genuine issue of material fact. If there are no unresolved material facts requiring a trial, we must then determine whether, under the

language of the policy, Mount Vernon is entitled to judgment as a matter of law.

In considering the language of the Protective Safeguards Endorsement to the policy, we examine the language of the endorsement without applying any rules of construction if the terms of the endorsement are clear. See *Carrothers Constr. Co. v. City of South Hutchinson*, 288 Kan. 743, 751, 207 P.3d 231 (2009). The test for determining the meaning of the language of an insurance policy is what a reasonable person in the position of the policyholder would understand the language to mean. *Farm Bureau Mut. Ins. Co. v. Horinek*, 233 Kan. 175, 180, 660 P.2d 1374 (1983). Unless a contrary intention is shown, words used in an insurance contract are to be given the natural and ordinary meaning they convey to the ordinary mind. *Kansas Farm Bureau Ins. Co. v. Cool*, 205 Kan. 567, 572, 471 P.2d 352 (1970).

*Discussion*

The basic factual premise for Mount Vernon's motion appears to be that the building had a fuse panel which was connected to the building's power source and was energized with electricity (statement of uncontroverted fact 19) and that the building used both fuses and circuit breakers to provide protection for the building's electrical service before the fire (statement of uncontroverted fact 24). The essence of Mount Vernon's defense is that Gold used fuses and circuit breakers in series on the same electrical circuit, in violation of the policy endorsement.

As we review the evidence, which consists of only bits and pieces of depositions and none of the deposition exhibits, the truth of this purported fact remains unresolved. Haley gave Mount Vernon a sworn statement in which he indicated that the electrical system had not been changed during the time Gold owned the building and that he had replaced fuses in the past. We do not know when Haley replaced fuses. But we do know that Ochoa installed on the premises an electrically operated walk-in cooler while Gold owned the building. Ochoa's testimony appeared to be all over the map. He said that when he installed the cooler, there was a fuse panel, circuit panel, and distribution panel from which the building's elec-

tricity was supplied. He said that when he finished his work the fuses were still energized. But later in the same deposition he testified: "Q. Were there any wires energizing any of the fuse holders in that fuse box? A. No, sir. Q. No doubt in your mind? A. No, sir."

Further, Hawk testified that when he examined the system after the fire, there were no wires supplying electricity to the fuse terminals and, in his opinion, those wires would have been so big that they would not have been fully consumed in the fire. It appeared to Hawk that the fuse box was being used simply as a passive junction box.

Mount Vernon does not contend that there were electrical circuits in the building that were protected only by fuses. Rather, it claims there is uncontroverted evidence that fuses and circuit breakers were used in series on at least one electrical circuit in the building. When considering this factual theory, it is apparent that there remains a genuine issue as to whether there were operating fuses in place in any of the electrical circuits in the Gold building at the time of the fire. It is not our task, nor was it the task of the district court, to weight conflicting evidence on this point in determining the outcome of the summary judgment motion. That task is reserved for the fact-finder at trial.

But even if it were undisputed that fuses and circuit breakers were used in series in the same electrical circuit in the Gold building, was that a *material* fact entitling Mount Vernon to judgment as a matter of law based on the plain language of the policy?

The Protective Safeguards Endorsement contains a schedule of required protective devices. The first entry on the schedule states: "All Electric is on Functioning and Operational Circuit Breakers." First, this provision lacks grammatical clarity. The adjective "Electric" has no noun to modify. Further, the verb requires a singular noun, which is contradicted by the adjective "All." Mount Vernon contends that what it really meant to say was that all electric circuits must be on functioning and operational circuit breakers. This, too, seems rather odd, since one would expect the breakers to be on the circuits, not the other way around. Be that as it may, in oral argument Gold expressed a willingness to acquiesce to this after-

the-fact policy redrafting. Therefore, for our purposes, we will presume that what Mount Vernon *meant* to say was that all electric circuits shall *have* functioning and operational circuit breakers.

Mount Vernon points to the testimony of Drews, its mechanical engineering expert. According to Drews, under a specific set of circumstances the presence of both fuses and circuit breakers in an electrical circuit can create a risk of fire greater than when only circuit breakers are present. But, as noted earlier, we give common, ordinary words their common, ordinary meaning and view the policy language from the perspective of an ordinary, reasonable policyholder.

As now reconstructed, the policy requires that all electric circuits have functioning and operational circuit breakers. It does not say "circuit breakers to the exclusion of fuses." There certainly is evidence in the record so far that there were circuit breakers in the line. The rub seems to be the possible presence of fuses in series with circuit breakers.

We are willing to reconstruct the Protective Safeguards Endorsement to make some sense out of it. But we are unwilling to read into the policy a wholly new provision: a requirement that there be no fuses in any electrical circuit serving the building.

A reasonable policyholder would not read the language of the policy as prohibiting the use of fuses. While Mount Vernon's expert sees danger in this practice, the average, reasonable policyholder would view the presence of multiple protective devices as a cautious belt-and-suspenders approach. Whole commercial product lines are built around downstream ground fault interrupters and surge protectors (some of which may use fuses) to protect expensive computers and other sensitive electronic devices. Whatever meaning can be derived from Mount Vernon's policy language, that meaning does not reasonably include a requirement that only circuit breakers may be used to protect an electrical circuit in the insured building.

Mount Vernon has failed to establish that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Therefore, we reverse the district court's contrary holding,

set aside the judgment, and remand the case to the district court for further proceedings.

Reversed and remanded.