No. 79,085

FIRST FINANCIAL INSURANCE CO., *Appellant*, v. VERDELL AND EARLENE BUGG, d/b/a TEWZ ENUFF, JOI WOODBERRY, TINA M. DAVIS, and LELA R. SMITH, *Appellees*.

(962 P.2d 515)

Opinion filed July 10, 1998.

*Larry G. Karns*, of Glenn, Cornish, Hanson & Karns, of Topeka, argued the cause and was on the brief for appellant.

*Gary D. White, Jr.*, of Schroer, Rice, P.A., of Topeka, argued the cause, and *James L. Wisler*, of the same firm, was on the brief for appellees Davis and Smith.

*Kala Spigarelli*, of Spigarelli, McLane & Short, of Pittsburg, was on the brief for appellee Woodberry.

The opinion of the court was delivered by

ABBOTT, J.: This is a declaratory judgment action brought by First Financial Insurance Company (First Financial) to determine if its liability insurance policy provided coverage for the incident in question. The policy at issue covers Verdell and Earlene Bugg doing business as Tewz Enuff, a bar, and their employees.

Joi Woodberry, Tina M. Davis, and Lela R. Smith were patrons in the bar and were shot during a disturbance in the bar when shots were exchanged between another patron and one or more insureds. The injured patrons filed suit alleging Verdell and Earlene Bugg and their employees negligently caused their injuries. First Financial insured the Buggs and filed a declaratory judgment action to determine whether the insurance policy provided coverage for the incident. The trial court held the insurance policy was ambiguous and that First Financial had a duty to defend the lawsuit. The injured patrons are the plaintiffs in the personal injury actions and defendants in this declaratory action along with the Buggs.

First Financial appealed and the case was transferred to this court pursuant to K.S.A. 20-3018(c). Three issues are presented. Defendants contend the insurance contract is ambiguous in that the exclusion clause relating to assault and battery and intentional acts is ambiguous and that their injuries were caused by an "occurrence" and were therefore covered under the insurance policy. They further claim that First Financial is estopped to deny coverage because it undertook defense of the personal injury action without disclaiming liability, etc.

When the shooting occurred, the bar was dark and filled to capacity. Trevor Russell exchanged words with Willie Bell, an employee of the bar. The two went outside where Bell eventually struck Russell in the face. Russell later reentered the bar with a gun and began firing; gunshots were returned by one or more employees.

The injured patrons filed suit claiming the Buggs were negligent for (a) firing a gun in a crowded tavern, (b) failing to have exits clearly marked within the tavern, and (c) failing to properly protect patrons from an assailant.

First Financial had a commercial insurance policy with Verdell and Earlene Bugg. The policy provides liability coverage for "bodily injury" and "property damage" caused by an "occurrence." The policy defines "occurrence" as an "accident, including continuous or repeated exposure to substantially the same general harmful conditions."

The policy has an "exclusion" section. The main body—"exclusion section"—provides in pertinent part:

"This insurance does not apply to
"(a) 'Bodily injury' or 'property damage' expected or intended from the standpoint of the insured. This exclusion does not apply to 'bodily injury' resulting from the use of reasonable force to protect persons or property."

The policy contains the following endorsement:

"COMBINATION ENDORSEMENT - LIABILITY INSURANCE
(INTERMEDIATE FORM)
THE FOLLOWING ENDORSEMENTS, EXCLUSIONS AND
CONDITIONS MODIFY INSURANCE PROVIDED UNDER THE
FOLLOWING COVERAGE PARTS.
THEY CHANGE THE POLICY. PLEASE READ THEM CAREFULLY.

COMMERCIAL GENERAL LIABILITY COVERAGE PART"

Under that section, clearly marked in capital letters is the following:

"EXCLUSION-ASSAULT OR BATTERY
Exclusion a. of COVERAGE A (Section I) is replaced by the following:
a. 'bodily injury,' 'property damage,' or 'personal injury':
(1) Expected or intended from the standpoint of any insured; or

(2) Arising out of assault or battery, or out of any act or omission in connection with the prevention or suppression of an assault or battery."

The Forms and Endorsement section clearly sets forth the endorsement and states it applies to coverage and is made part of the policy.

Six days after the incident, First Financial caused a letter to be sent to the Buggs stating that it would investigate the March 25 incident, but that it reserved "the right at any time to withdraw from such investigation, discussion, or other actions, and to disclaim liability under the policy, for the reasons stated and for such others that may appear, upon giving such advanced notice as the circumstances may permit." On November 14, 1994, First Financial caused another letter to be sent to the Buggs informing them that due to the policy's assault and battery exclusion, First Financial was denying coverage for any claims occurring as a result of the March 25 incident. The letter also noted that the Buggs had been advised of First Financial's notice of non-waiver and reservation of rights on March 31, 1994.

On July 7, 1995, First Financial sent a letter to the Buggs via certified mail. This letter quoted the assault and battery exclusion and stated that "[d]ue to, but not necessarily limited to the above exclusions, First Financial Insurance Company contends that you may not have coverage for this occurrence." The letter continued:

"As it appears that the interest of both you and the Company may be better served and protected, the Company will undertake the defense of this action under a full and complete reservation of rights and without prejudice to the rights of the parties under the terms and conditions of your policy."

This letter also informed the Buggs that First Financial had referred the defense of the matter to a law firm for a defense, but qualified its obligation by stating that

"[a]ny action taken by or on behalf of First Financial Insurance Company or its representatives, in the handling of this matter shall not be deemed a waiver of any rights, and the Company may have to disclaim coverage under the terms and conditions set forth above and withdraw from this case."

Ultimately, the district court held that "[t]he policy is ambiguous, and as such, must be construed in favor of the insured." Con-

sequently, the court ruled, First Financial is obligated to represent the Buggs (the insureds) in the lawsuits brought by Woodberry, Davis, and Smith. Furthermore, the district court ruled that First Financial is liable for any legal obligations the Buggs incur due to injuries sustained by Woodberry, Davis, and Smith.

## A. STANDARD OF REVIEW

Woodberry, Davis, and Smith claim First Financial's policy is ambiguous and, consequently, the construction most favorable to the insured must prevail. *Gowing v. Great Plains Mutual Ins. Co.*, 207 Kan. 78, Syl. ¶ 1, 483 P.2d 1072 (1971).

"As a general rule, the interpretation or construction and meaning and legal effect of written instruments are matters of law exclusively for the court and not questions of fact for determination by the jury. *Federal Land Bank of Wichita v. Krug*, 253 Kan. 307, 311, 856 P.2d 111 (1993). Regardless of the construction given a written contract by the trial court, an appellate court may construe a written contract and determine its legal effect. [Citation omitted]." *Spivey v. Safeco, Ins. Co.*, 254 Kan. 237, 240, 865 P.2d 182 (1993).

Policies must be construed according to the sense and meaning of the terms used, and if the language is clear and unambiguous, it must be taken in its plain, ordinary, and popular sense. *Bramlett v. State Farm Mutual Ins. Co.*, 205 Kan. 128, 130, 468 P.2d 157 (1970). Similarly, courts should not strain to create an ambiguity where, in common sense, there is none. *Bell v. Patrons Mut. Ins. Ass'n*, 15 Kan. App. 2d 791, 794, 816 P.2d 407, *rev. denied* 249 Kan. 775 (1991). The test to determine whether an insurance contract is ambiguous is not what the insurer intends the language to mean, but what a reasonably prudent insured would understand the language to mean. *Farm Bur. Mut. Ins. Co. v. Winters*, 248 Kan. 295, 300, 806 P.2d 993 (1991).

The district court delineated "concealment of the exclusionary clause" as one of the reasons for holding that First Financial's policy was ambiguous. The judge noted that the policy has "twelve pages which speak to the policy coverage and exclusions (hereinafter Coverage Form), nine pages which speak to deductibles and limitations of the policy, and more than twenty pages of supplemental forms which include changes in coverages and exclusions."

The district court also found that the contract was ambiguous because of the placement of the coverage portions, in relationship to the exclusions. The trial judge found it particularly troublesome that the policy's coverage was set out on page one, but the disputed exclusion

"is found at page twenty-one of the supplementary forms, among a long list of supplemental exclusions. This supplemental exclusion is meant to replace the original exclusion found on page one of the Coverage Form. The original exclusion prohibits intentional acts but permits the Buggs to use reasonable force to protect persons or property. The supplemental exclusion has been taken out of context and placed subtly on page forty-two of the forty-seven pages of text which make up the insurance policy. 'The exclusion is, in fact, not as readily apparent or as prominently placed as the insuring agreement.' Gowing, 207 Kan. at 82. On one page, the policy allows the Buggs to protect their patrons and property, while thirty-one pages later, the policy prohibits any action by the Buggs to suppress danger to their patrons and property."

In the Gowing case, cited by the trial judge, the disputed exclusion clause excluded coverage for bodily injury or property damage caused intentionally by, or at the direction of, the insured. In Gowing, appellant was involved in a fight and was sued for assault and battery. Appellant provided for his own defense and judgment was entered in his favor. He subsequently brought suit against Great Plains to recover the attorney fees he had incurred while defending the action. Great Plains maintained that it had no duty to defend him because the lawsuit charged him with an intentional injury, which was expressly exempted from the policy's coverage.

The Gowing court reasoned that Great Plains' policy was basically a comprehensive policy insuring the appellant against certain perils, as well as insuring appellant himself against liability. The policy consisted of two pages, with page two containing the terms of Great Plains' obligation conspicuously at the top of the page. The policy promised to pay on behalf of the insured any sums that appellant legally became obligated to pay as damages for bodily injury or property damage, as well as promising to defend any lawsuit brought against him alleging such bodily injury or property damage and seeking damages payable under the terms of the policy, even if the allegations were groundless, false, or fraudulent.

The Gowing court ultimately held:

"We believe the average man, in reading the foregoing provisions in their entirety, would conclude, and be fully justified in so doing, that he was buying a defense to whatever lawsuit might be filed against him seeking damages to person or to property. The language positioned at the top of the page is broad and sweeping in its scope. It would tend to lead a reasonably naive insurance customer to expect that a defense would be provided against personal injury actions filed against him, whether the alleged injury be calculated or unintentional.

"This court follows the general rule that in determining the intention of the parties to a contract of insurance, the test is not what the insurer intends the printed words of the policy to mean, but rather what a reasonable person placed in the position of the insured would have understood the words to mean. (*Casey v. Aetna Casualty & Surety Co.*, 205 Kan. 495, 499, 470 P.2d 821; *Kansas Farm Bureau Ins. Co. v. Cool*, 205 Kan. 567, 572, 471 P.2d 352, and cases cited therein.)

"In contrast to the prominence accorded the insuring agreement found under Coverage G at the top of page two, the exclusion clause on which the insurer relies is placed inconspicuously in a long paragraph near the bottom of the same page. Although the lengthy paragraph covers a number of exclusions as to coverage—both casualty and liability—they are strung together in continuous sequence without break, subparagraph or indentation. The exclusion is, in fact, not as readily apparent or as prominently placed as the insuring agreement. Hence we are not disposed to say that the insurer's grandly stated promise to defend is clearly and expressly limited to lawsuits based on unintentional torts." 207 Kan. at 81-82.

The *Gowing* case also reviewed certain fundamental principles applicable to insurance contracts:

"In *Buchanan v. Employers Mutual Liability Ins. Co.*, 201 Kan. 666, 443 P.2d 681, this court held that inasmuch as the insurer prepares the policy, the burden is upon him to establish facts which bring the case within the exceptions set forth in the policy. (See, also, *Southards v. Central Plains Ins. Co.*, 201 Kan. 499, 441 P.2d 808.)

"In similar vein the federal court in *Prickett v. Hawkeye-Security Insurance Company*, 282 F.2d 294, stated that if an insurer intends to restrict its coverage it must use language clearly stating its purpose and that this rule of construction applies with particular force to provisions which attempt to exclude liability coverage under certain conditions.

"This court, also, has said that where an insurance company desires to limit its liability under a policy, it should employ such language as will clearly and distinctly reveal its stated purpose. (*Miller v. Farmers Mutual Automobile Ins. Co.*, 179 Kan. 50, 55, 292 P.2d 711; *Chicago, R. I. & Pac. Rld. Co. v. Aetna Ins. Co.*, 180 Kan. 730, 737, 308 P.2d 119.) Unclear and obscure clauses in a policy of insurance should not be permitted to defeat the coverage which is reasonably to be expected

by the insured. (*Sturdy v. Allied Mutual Ins. Co.*, 203 Kan. 783, 793, 457 P.2d 34.)" 207 Kan. at 80-81.

First Financial attempts to distinguish its policy from the policy analyzed in *Gowing*, by asserting that in contrast to the exclusion in *Gowing*, its assault and battery exclusion was not printed in small type, nor was it hidden among a long paragraph of endorsements. Its endorsement explicitly stated that it was changing the assault and battery exclusion found in part A of the liability section coverage and this section was set out in bold, capital letters, with each exclusion within the endorsement section clearly separated from the others.

Also, the policy was a standard insurance contract with endorsements changing parts of the policy. Furthermore, the policy warned the Buggs that such endorsements changed their coverage. The policy, in large lettering, provides:

"THE FOLLOWING ENDORSEMENTS, EXCLUSIONS AND CONDITIONS MODIFY INSURANCE PROVIDED UNDER THE FOLLOWING COVERAGE PARTS. THEY CHANGE THE POLICY. PLEASE READ THEM CAREFULLY."

The first page of the policy does refer conspicuously to the combination endorsement section, which is titled in large bold print and warns the insured that the applicable endorsements change the policy and should be read carefully. When the contract is considered as a whole and not in its fragmented form, it is not ambiguous. "Ambiguity is not to be derived from or created by the fragmentation of the contract. *Farm Bureau Mut. Ins. Co. v. Horinek*, 233 Kan. 175, 180, 660 P.2d 1374 (1983). The terms of the insurance contract must be considered as a whole. [Citation omitted.]" *Nash v. Adkins*, 11 Kan. App. 2d 326, 329, 720 P.2d 1129 (1986). Further, "[t]he language of an exclusionary clause in an insurance policy must be afforded its plain, ordinary meaning. Courts should not strain to create an ambiguity where, in common sense, there is none." *Newton v. Nicholas*, 20 Kan. App. 2d 335, Syl. ¶ 3, 887 P.2d 1158, *rev. denied* 257 Kan. 1093 (1995).

The district court also held First Financial's policy was ambiguous because of its "contrasting statements of coverage." The trial court held that

"various provisions of the policy state that the insurer will be liable regardless of fault. The portion of the policy entitled COVERAGE C. MEDICAL PAYMENTS, states that '[the insurer] will make those payments regardless of fault.' Insurance policies which include such provisions in portions of the contract, while excluding damages due to intentional acts in other portions of the contract, may be viewed by a court as ambiguous. Due to contrasting statements of coverage and the concealment of the exclusionary clause, the insurance policy is ambiguous and must be given the meaning which an insured would reasonably expect. *Gowing*, 207 Kan. at 80."

Although the coverage portion of the policy provides for medical payments regardless of fault, such medical payments are subject to the same exclusions as the general liability section. The exclusions are on the same page as the coverage for medical payments and appear in the same size print, as well as the same type of print as the provisions under the "insuring agreement." Furthermore, the exclusion is under a section titled "Exclusions."

An insurance contract can provide coverage, while qualifying that coverage with an exception, as long as the exception is clear and unambiguous. Such exceptions, however, will be strictly construed against the insurer. The coverage for medical payments and the exceptions to the coverage are clearly stated, and the exclusions are located on the same page as the provided coverage. There is no ambiguity due to conflicting language regarding medical payments and intentional acts.

## B. IS THE ASSAULT AND BATTERY EXCLUSION AMBIGUOUS?

An insurance policy is not ambiguous "unless there is genuine uncertainty as to which of two or more possible meanings is proper." *House v. American Fam. Mut. Ins. Co.*, 251 Kan. 419, Syl. ¶ 3, 837 P.2d 391 (1992); see *Spivey v. Safeco Ins. Co.*, 254 Kan. at 240.

Other jurisdictions have found that assault and battery clauses are not ambiguous, even when assault and battery is not defined in the policy. In *Acceptance Ins. Co. v. Walkingstick*, 887 F. Supp. 958 (S.D. Tex. 1995), the court ruled that an assault and battery exclusion was unambiguous under similar facts to the case at hand. In *Walkingstick*, an individual entered the Harrisburg Country

Club (HCC), which was owned and operated by Weyel Foster and Nguyen Phung Kim. The individual started an altercation, gunfire ensued, and one patron was injured, while two were killed. The Walkingsticks, relatives of Espinosa, one of the patrons killed during the altercation, asserted that Foster, Kim, and HCC were negligent in "(1) employing staff incapable of responding to a disagreement in such a manner as to prevent the use of deadly force on patrons . . . . The Walkingsticks contend[ed] that Foster's, Kim's, and HCC's negligence proximately caused the assault which resulted in the injury and subsequent death of Espinosa." 887 F. Supp. at 959-60.

Acceptance Ins. Co. (Acceptance) insured Kim d/b/a HCC at the time of the shooting incident. The assault and battery provision in *Walkingstick* excluded coverage for "'Bodily Injury, including death, and/or Property Damage arising out of an assault and/or battery or out of any act or omission in connection with the prevention or suppression of such acts whether caused by or at the instigation or direction of the insured, his employees, patrons or any other person' ('the assault and battery exclusion')." 887 F. Supp. at 962. The *Walkingstick* court held that the assault and battery exclusion precluded coverage for the death of Espinosa because "[c]ourts interpreting assault and battery exclusion clauses similar to the one at issue in this case have held the clause to be clear and unambiguous." 887 F. Supp. at 962. Furthermore,

"[a]ssault and battery exclusionary clauses exclude coverage of all claims arising out of an assault and battery regardless of the cause. [Citations omitted.] For instance, in *Garrison [v. Fielding Reinsurance, Inc.*, 765 S.W. 2d 536 (Tex.App. - Dallas 1989, *writ denied*)], the Texas court of appeals held that the assault and battery exclusion contained in a restaurant's insurance policy precluded coverage for claims made by a couple attacked by an unknown assailant in the parking lot of the restaurant because the plaintiffs would never have brought the lawsuit absent the assault and battery committed by the unknown assailant. *Garrison*, 765 S.W. 2d at 538. Moreover, in *Audubon Indem. Co. [v. Patel*, 811 F. Supp. 264 (S.D. Tex. 1993), it was] held that an assault and battery exclusion in an insurance policy excludes coverage of any damages arising out of an assault and battery as a matter of law, even if the legal theory under which the insured is found liable is negligence. *Audubon Indem. Co.*, 811 F. Supp. at 265." 887 F. Supp. at 962.

The *Walkingstick* court thus held that

"it is apparent from the petition filed in state court that the Walkingsticks would never have brought negligence claims against Foster, Kim, and HCC absent the assault and battery committed by a third party on Espinosa while he was a patron of HCC. Accordingly, the assault and battery clause contained in the insurance policy at issue bars coverage for the negligence claims made by the Walkingsticks in the state action." 887 F. Supp. at 962.

The plaintiff in *Nastasia v. Sylvan Inc.,* 617 So. 2d 128 (La. App. 1993), made the same argument against First Financial that appellees make in the case at hand. In *Nastasia,* the sole issue was whether summary judgment was appropriate in light of the language of the assault and battery exclusion in First Financial's insurance policy with Sylvan. The plaintiff filed suit against Sylvan, Inc. d/b/a The Palladium after a fight broke out among some of the patrons. Plaintiff claimed he was not involved in the fight, but was struck and cut in the face with a beer bottle and thrown to the ground by an employee of The Palladium. Plaintiff received a number of stitches and underwent plastic surgery to remove the scar on his cheek. He then brought suit against Sylvan and First Financial for past and future medical expenses, as well as past, present, and future pain, suffering, discomfort and mental distress. The trial court granted First Financial's motion for summary judgment, which asserted that plaintiff's claim was barred by the assault and battery provision of First Financial's insurance policy.

Upon appeal, the court set out the disputed assault and battery exclusion:

"It is agreed and understood that this Insurance does not apply to bodily injury or property damage arising out of assault and battery or out of any act or omission in connection with the prevention or suppression of such acts, whether caused by or at the instigation or direction of the Insured, his employees, patrons or any other person." 617 So. 2d at 129.

The court stated:

"Our jurisprudence indicates that '[i]f the language of an insurance policy and its endorsements are clear and unambiguous, then a reasonable interpretation consistent with the obvious meaning and intent of the policy must be given. . . . Any provision in the contract which limits liability must be given effect.' [Citations omitted.]" 617 So. 2d at 129.

The *Nastasia* court rejected the plaintiff's argument that, "because the terms 'assault and battery' are not explicitly defined in the insurance policy, the exclusion is fatally ambiguous." 617 So. 2d at 129.

*Gaspard v. Northfield Ins. Co.*, 649 So. 2d 979 (La. App. 1994), *writ denied* Feb. 9, 1995, upheld an assault and battery exclusion. In *Gaspard*, Murphy Gaspard was shot and killed in the course of a robbery as he was leaving the Greinwich Bowlarena bowling alley, owned and operated by Sonnier Products, Ltd (Sonnier). Gaspard's wife and children (the Gaspards) filed suit against Sonnier and Northfield Insurance Company (Northfield), among others, alleging that the defendants were liable for their failure to provide adequate security and lighting in the Greinwich Bowlarena parking lot. Northfield filed a motion for summary judgment denying liability because its insurance policy with Sonnier specifically excluded from coverage any claim arising from an assault and battery.

The exclusion at issue in *Gaspard* stated: "This insurance does not apply to: a. 'Bodily injury' or 'property damage': (1) expected or intended from the standpoint of any insured. (2) arising out of assault and battery, or out of any act or omission in connection with the prevention or suppression of an assault and battery." Appellants first asserted the policy was ambiguous because it was unclear whether the two clauses, (1) and (2), should be read conjunctively or disjunctively. The *Gaspard* court found that the language of the policy as a whole showed that this argument was without merit. 649 So. 2d at 982.

The *Gaspard* court also addressed appellants' argument that

"the 'assault and battery' exclusion is ambiguous because there is no specific language which excludes assault and battery by third parties. However, again we find no ambiguity. The insurance policy clearly excludes from coverage 'Bodily injury or property damage . . . arising out of assault and battery. . . . ' This exclusion contains no qualifying language that its applicability should be limited to certain persons, but, on the contrary, encompasses every situation relating to assault and battery regardless of the perpetrator. Thus, we find that appellants' assignment of error is without merit." 649 So. 2d at 982.

In *Kelly v. Figueiredo*, 610 A.2d 1296 (Conn. 1992), the issue was whether an assault and battery exclusion clause in a liquor

seller liability insurance policy was ambiguous, such that the policy covered damages caused by an assault and battery perpetrated by an intoxicated patron. Calvert Insurance Company's policy had the following exclusionary endorsement:

" 'ASSAULT AND BATTERY EXCLUSION: It is agreed that the insurance does not apply to bodily injury or property damage arising out of assault and battery or out of any act or omission in connection with the prevention or suppression of such acts, whether caused by or at the instigation or direction of the insured, his employees, patrons or any other person.' " 610 A.2d at 1297.

The insured claimed that the exclusion clause was ambiguous and, therefore, must be construed against Calvert, the drafter of the policy. The insured contended that different interpretations of the language of the assault and battery exclusion made it ambiguous. The *Kelly* court held:

"The exclusion clause is not ambiguous. The words at issue do not have multiple definitions. See *Beach v. Middlesex Mutual Assurance Co.*, [205 Conn.] at 251, 532 A.2d at 1297 [1987] (finding the word 'collapse' ambiguous as used in an insurance policy because it may mean 'a catastrophic breakdown' or 'a breakdown or loss of structural strength'). We can say with a high degree of certainty that the exclusion clause was intended to exclude all assaults and batteries from coverage. See *Griswold v. Union Labor Life Ins. Co.*, 186 Conn. 507, 514, 442 A. 2d 920 (1982) (finding ambiguity where 'we cannot say with any degree of certainty [what the clause] was intended to exclude'). The exclusion clause therefore unambiguously relieves Calvert of any obligation to defend or indemnify the insured in this case." 610 A.2d at 1299.

Likewise, in *Britamco Underwriters v. J.O.C. Enterprises, Inc.*, 623 N.E.2d 1036 (Ill. App. 1993), *app. denied* 733 N.E.2d 2 (1994), the court held that the assault and battery endorsement

"is susceptible to only one reasonable interpretation: the policy does not cover claims arising from assault or battery, regardless of what name is given to the actions compromising the assault and battery. The endorsement is redundant and prolix, but in no way ambiguous. Where provisions in an insurance contract are clear and unambiguous, a court will apply the provisions as written, giving the words of the policy their plain and ordinary meaning. [Citation omitted.]" 623 N.E.2d at 1039.

Davis and Smith assert the assault and battery provision is ambiguous because there are different possible meanings for assault and battery. Davis and Smith cite the definition of assault and

battery provided in the criminal code and the definition of battery in PIK Civ. 2d as authority for the argument that assault and battery are ambiguous due to differing meanings.

Davis and Smith also cite the definition from Black's Law Dictionary as exemplifying the different definitions of assault and battery. It defines "assault and battery" as "[a]ny unlawful touching of another which is without justification or excuse. It is both a tort, [citation omitted], as well as a crime, [citation omitted.]" Black's Law Dictionary 115 (6th ed. 1990). The civil definition of battery is "[i]ntentional and wrongful physical contact with a person without his or her consent that entails some injury or offensive touching. [Citation omitted]." Black's Law Dictionary 152 (6th ed. 1990). Criminal battery is "the unlawful application of force to the person of another . . . . The actual offer to use force to the injury of another person is assault; the use of it is battery, which always includes an assault; hence the use of the two terms are commonly combined in the term 'assault and battery.' " Black's Law Dictionary 152-53 (6th ed. 1990).

Davis and Smith consequently contend that the various definitions of assault and battery show the ambiguity of battery. They argue the following questions relating to the definition of battery prove it is an ambiguous word: What kind of touching is unlawful? Must the touching cause bodily harm or be done in a rude, insulting, or angry manner? Is it sufficient to be a touching without justification or excuse? Thus, they argue that First Financial could have defined battery, but it did not. Consequently, the exclusion clause must be strictly construed against First Financial, and if the clause cannot be given a clear and unambiguous meaning, it must be disregarded.

The failure of an insurance policy to specifically define a word does not necessarily create ambiguity. Although assault and battery have varying definitions, these definitions only slightly deviate and regardless of the definition used, they all convey the same general meaning. In the case at hand, the definitions of assault and battery do not present various and distinct definitions. The March 25 incident would be deemed a battery in the criminal context, as well as the civil context. Furthermore, all of the above definitions com-

port the same overall meaning. Consequently, the terms assault and battery are not ambiguous because they are not "open to different interpretations." *Lightner v. Centennial Life Ins. Co.*, 242 Kan. 29, 35, 744 P.2d 840 (1987).

## C. EXPECTED OR INTENDED

The policy excludes coverage for " 'bodily injury' or 'property damage' expected or intended from the standpoint of the insured." The assault and battery exclusion, found in the endorsements, adds an exclusion for 'personal injury' that is expected or intended from the standpoint of the insured.

First Financial argues that the law in Kansas regarding insuring agreements excluding damages expected or intended by the insured excludes coverage for all of the natural and probable consequences of an intentional act. "We do not follow the specific intent rule. Rather, we have adopted the natural and probable consequences test. See *Bell*, 234 Kan. 461, Syl. ¶ 2." *Harris v. Richards*, 254 Kan. 549, 553, 867 P.2d 325 (1994). Here, the insureds' intent to injure is a moot point and is not an issue in this case.

## D. ALLEGING A NEGLIGENCE THEORY

Woodberry contends that she has not alleged any assault and battery actions. Rather she has alleged that the insured was negligent in firing a gun into a crowded tavern without regard for the safety of the patrons inside the tavern, failing to have exits within the tavern appropriately marked and available for public use, and failing to properly protect patrons from an assailant who was firing a gun.

Davis and Smith admit that Count I of their petitions are based on an assault and battery theory and that First Financial is not liable for a judgment or a defense on Count I. Count I alleges that Davis and Smith were shot by Verdell Bugg or his employees. Counts II and III, however, are based on the alleged negligent acts of Tewz Enuff, rather than its intentional acts. Count II of Davis' and Smith's second amended petitions allege that Tewz Enuff had a duty to protect them, had reason to anticipate the incident, and failed to exercise reasonable care to forestall and prevent it. Fur-

ther, under Count III of Davis' and Smith's second amended petitions, they allege "negligent infliction of emotional distress."

Davis and Smith thus argue that Counts II and III of their petitions are based on the totality of events which occurred at Tewz Enuff on March 25, 1994. These events caused Davis and Smith severe emotional distress and specifically caused Smith post traumatic stress syndrome, as well as immediate physical injury to both Davis and Smith. The injuries were neither expected nor intended from the standpoint of the insured, Tewz Enuff. Therefore, Davis and Smith conclude that the assault and battery exclusion does not apply, and First Financial is required to provide a defense and coverage.

Davis and Smith cite *Harris v. Richards*, 254 Kan. 549, 867 P.2d 325 (1994), as authority for the proposition that an intentional injury exclusion is inapplicable under the innocent bystander theory. The *Harris* court did not analyze and rule that an intentional injury exclusion is inapplicable under a mistaken identity or innocent bystander theory. The *Harris* court simply noted:

"Harris [the plaintiff] claims that his shooting was either due to mistaken identity or was an unintentional and unforeseen injury to an innocent third party. He emphasizes that no similar fact situation has been decided under Kansas law. Harris suggests that courts in other jurisdictions have nearly uniformly held that an intentional injury exclusion is inapplicable under either the mistaken identity or innocent bystander theories." 254 Kan. at 554.

The *Harris* court went on to explain that Harris asserted his injuries were not the natural and probable consequences of the shooter's intended actions, but he did not take the position that the specific injury test should replace the natural and probable consequences approach which has been developed under Kansas case law. 254 Kan. at 554. Under the natural and probable consequences approach, "an insured is presumed to intend the natural and probable consequences of his or her acts." 254 Kan. at 556. See *Bell v. Tilton*, 234 Kan. 461, 470-71, 674 P.2d 468 (1983). Furthermore, the *Harris* court noted:

"We recently observed in *Spivey* that '[a] liability provision in an insurance contract excluding coverage for injuries expected or intended from the standpoint of the insured excludes from coverage an injury which the insured intentionally

caused.' 254 Kan. 237, Syl. ¶ 5. *Spivey* also reiterates our analysis of the natural and probable consequences test as discussed and applied in *Bell*. 254 Kan. at 245." 254 Kan. at 556.

Davis and Smith contend that because the *Harris* court found that the plaintiff had not presented any evidence that he was simply an innocent bystander, his injuries were the natural and probable consequence of the insured's intended actions. Davis and Smith make a jump in logic, however, and contend that under *Harris*, the Kansas Supreme Court has recognized an exception for the innocent bystander and that exception applies to the assault and battery exclusion in the case at hand. The *Harris* case does not stand for an innocent bystander exception.

In *Bell v. Tilton*, 234 Kan. 461, the plaintiff also alleged a negligence theory in his action against Tilton. Bell's insurance policy contained an exclusion for acts that were expected or intended from the standpoint of the insured. The *Bell* court explained that if, from the acts, circumstances, and inferences of the case, it appears that one "had the desire to cause the consequences of his acts or he believed the consequences were substantially certain to result, his conduct was intentional and the policy exclusion was operative." 234 Kan. at 472. The *Bell* court held:

"The trial court's determination the intentional aiming and firing of a BB gun at the face of the injured party was not covered by insured's liability insurance policy which excluded injuries intended or expected from the standpoint of the insured is affirmed notwithstanding the fact there was some evidence by the insured that he did not intend to cause the particular injury which resulted from his acts. The trial court properly held the insured's statements relative to his intent were not conclusive on the issue of whether the insured's acts were intentional and that such determination must be based on the totality of the evidence relative thereto." 234 Kan. 461, Syl. ¶ 3.

Courts analyzing this issue have consistently held that the theory of liability is irrelevant when the injuries arose out of an assault and battery. Thus, the negligence claims do not affect the applicability of the assault and battery exclusion. In *Terra Nova Ins. Co. v. North Carolina Ted, Inc.*, 715 F. Supp. 688 (E.D. Pa. 1989), a patron was shot and seriously injured by another patron at Ted's Spot III, a Philadelphia, Pennsylvania, bar operated by North Car-

olina Ted, Inc. The assault and battery exclusion in the policy at issue in *North Carolina Ted* stated: "It is agreed that no coverage shall apply under this policy for any claim, demand or suit based on Assault and Battery, and Assault and Battery shall not be deemed an accident, whether or not committed by or at the direction of the Insured." 715 F. Supp. at 690. The *North Carolina Ted* court first compared this case with a similar case, *Terra Nova Insurance Co., Ltd. v. Thee Kandy Store, Inc.*, 679 F. Supp. 476 (E.D. Pa. 1988).

In the *Thee Kandy Store* case, the issues were nearly the same, but the alleged perpetrators of the assault were employees of the insured's bar. The injured patron in *Thee Kandy Store* claimed that the defendants were negligent in failing to prevent the assault and battery. The court held that "this allegation is not sufficient to avoid a properly executed assault and battery exclusion. Regardless of the language of the allegations, the original cause of the harm arose from an alleged assault and battery." 715 F. Supp. at 690 (citing *Terra Nova Insurance Co., Ltd. v. Thee Kandy Store, Inc.*, 679 F. Supp. at 478).

Likewise, the *North Carolina Ted* court held that because the injured patron's claims of negligence against the insured for failing to prevent the shooting arose from an alleged shooting incident, such claims "would not fall within the policy's coverage because of the assault and battery exclusion." 715 F. Supp. at 691. The rules regarding the analysis of insurance contracts and their exceptions used in *North Carolina Ted* mirror the Kansas standards. 715 F. Supp. at 691. Davis and Smith's arguments fail.

## E. ESTOPPEL

Davis and Smith argue that an insurance company cannot undertake to defend a lawsuit brought against its insured and then deny coverage under the policy, unless the insurance company has given specific notice to its insured of its non-waiver and reservation of rights to deny coverage. Davis and Smith claim that First Financial sent a reservation of rights letter to the Buggs regarding Joi Woodberry's suit, but First Financial sent no such reservation of rights letter to the Buggs when it undertook the defense of the

actions by Davis and Smith on March 26 and 27, 1996. James Wisler, the attorney for Davis and Smith, submitted their petitions against the Buggs, d/b/a Tewz Enuff, on March 14, 1995.

On March 26, 1996, an attorney with Gehrt & Roberts appeared for Tewz Enuff at a discovery conference. On March 27, 1996, an attorney from the same firm entered an appearance on behalf of Tewz Enuff. Davis and Smith cite *Henry v. Johnson*, 191 Kan. 369, 381 P.2d 538 (1963), as authority for the position that First Financial is estopped from denying coverage for Davis and Smith. The *Henry* court stated:

"It is a well-established rule that where an insurance company under a liability policy takes charge of the only defense which may then be imposed to an action on which liability rests (here, a motion to set aside a default judgment and answer on the merits), it will be estopped from thereafter questioning the claim because it was beyond the terms of the policy or because of a breach of a noncoverage clause, unless it gives notice of its right to set up the defense of noncoverage under an adequate and proper non-waiver and reservation of rights notice to the *insured*. [Citations omitted.]" (Emphasis added.) 191 Kan. at 376.

The *Henry* court refers to the holding in *Snedker v. Derby Oil Co., Inc.*, 164 Kan. 640, 192 P.2d 135 (1948). The *Snedker* court held that

"under the general rule a liability insurer which assumes the defense of an action against the insured may save itself from the bar of waiver or estoppel in a subsequent action upon the policy if, in the action against the insured, it clearly disclaims liability under the policy, and gives notice of its reservation of a right to set up the defense of noncoverage." 164 Kan. at 644.

In *Snedker*, there was no contention that the insurance carrier made such a disclaimer of liability or reserved the right to assert noncoverage in any subsequent action against it. First Financial, however, expressly disclaimed liability in its November 14, 1994, letter and gave notice of its right to set up the defense of noncoverage. The November 14, 1994, letter sent to the Buggs defeats Davis and Smith's estoppel argument. It stated:

"First Financial Insurance Company informed us and asked that we advise you, that coverage was being denied under their Commercial General Liability policy number F101S400025 issued to you, for any claims as a result of the incident on or about March 25, 1994 at the Tewz Enuff, 1465 S.E. Washington Street, Topeka, Kansas.

. . . .

"You were advised of the First Financial Insurance Company's Notice of Non-Waiver and Reservation of Rights on March 31, 1994 and First Financial Insurance Company has now advised us of the denial of coverage for the reason stated above [the assault and battery exclusion]."

In First Financial's Reservation of Rights letter of July 7, 1995, in reference to Woodberry's suit, First Financial again set out the assault and battery exclusion in the Buggs' policy and stated that due to, but not necessarily limited to the assault and battery exclusion, "you may not have coverage for this occurrence." The letter further stated:

"As it appears that the interest of both you and the Company may be better served and protected, the Company will undertake the defense of this action under a full and complete reservation of rights and without prejudice to the rights of all parties under the terms and conditions of your policy.

"We have referred the defense of this matter to the law firm of Gehrt & Roberts, Chartered. . . .

"Any action taken by or on behalf of First Financial Insurance Company or its representatives, in the handling of this matter shall not be deemed a waiver of any rights, and the Company may have to disclaim coverage under the terms and conditions set forth above and withdraw from this case."

Davis and Smith did not file their petitions until March 1995. First Financial had disclaimed liability in the November 14, 1994, letter as to all claims as a result of the March 25, 1994, shooting incident. The November 14, 1994, letter also incorporated by reference its reservation of rights stated in the March 31, 1994, letter to the Buggs.

First Financial asserts that Davis and Smith's argument that First Financial should have sent a reservation of rights letter for each complaint filed is deficient because the policy is a contractual matter between the insurance company and the insured. In the case at hand, the Buggs were the insureds, and they were informed of the insurance company's reservation of rights. The November 14, 1994, letter made it clear that First Financial declined coverage.

Thus, First Financial is not estopped from denying coverage of the Davis and Smith's suit, which is clearly a claim resulting from the March 25, 1994, incident. First Financial denied coverage for *any claims* in the letter of November 14, 1994. First Financial also

established its reservation of rights regarding Davis and Smith's suit because the November 14 letter stated that "[y]ou were advised of the First Financial Insurance Company's Notice of Non-Waiver and Reservation of Rights on March 31, 1994." A reasonable interpretation of a letter that denies coverage for any claims and refers to its reservation of rights, is that the reservation of rights also applies to any claims. The remaining issues and arguments are moot.

Reversed.