**MMA INSURANCE COMPANY, Plaintiff/Counterclaim Defendant,**

v.

**BLUE CROSS AND BLUE SHIELD OF KANSAS, INC., Defendant/Counter-claimant.**

**No. 02–1451–WEB.**

United States District Court, D. Kansas.

Jan. 14, 2004.

Gilbert L. Guthrie, Cessna Finance Corporation, Wichita, KS, for Plaintiff/Counterclaim Defendant.

Eric I. Unrein, Michael J. Unrein Davis, Unrein, Biggs and Head, LLP, Topeka, KS, for Defendant/Counter-claimant.

### Memorandum and Order

Wesley E. Brown, Senior District Judge.

The issue in this declaratory judgment action is which of two insurers is responsible for health care costs incurred in January of 2000 for the treatment of newborn infant "Baby Doe" When Baby Doe was born prematurely on December 31, 1999, he was a covered dependent under an MMA Insurance group health contract issued to his parents' employer. Because the employer decided to change carriers, however, the MMA contract expired at the end of 1999 and was replaced by a Blue Cross and Blue Shield of Kansas (BCBSKS) group health plan effective January 1, 2000. Due to the fact that Baby Doe's hospitalization began before expiration of the MMA contract and continued for several months thereafter, the MMA contract—consistent with the requirements of Kansas law—provided continuing coverage for Baby Doe for 31 days following expiration of the contract (i.e., for the month of January 2000). The BCBSKS group health insurance contract also provided coverage for Baby Doe during that period. Substantial health care costs were incurred in January 2000 for treatment of Baby Doe. BCBSKS paid the January 2000 costs and is now seeking reimbursement from MMA. The matter is before the court on the parties' cross-motions for summary judgment.

1. *Facts.*

The parties have provided a statement of stipulated facts in this case.[1]

1. MMA and BCBSKS issue health insurance policies in Kansas.

2. In December 1999, a pregnant mother, Jane Doe, was admitted to a Kansas hospital while covered under a group health insurance contract issued by MMA. (*See Attachment 1, Stipulations* ).

3. During her admission, and before MMA's group health insurance contract terminated, Mrs. Doc gave birth to a child. Baby Doe, born late in the day on December 31, 1999.

4. MMA insured Baby Doe under the group health insurance contract from the moment of Baby Doe's birth.

5. At or about 11:59:59 p.m., MMA's group health contract expired.

6. BCBSKS issued a replacement group insurance contract to Mr. Doe's employer. (*See Attachment 2, Stipulations* ).

7. The replacement contract was intended to afford continuous health insurance coverage to qualified participants in the employer's health plan.

8. The replacement contract provided continuous coverage to the Does, beginning at or about 12:00:00 a.m., January 1, 2000.

9. Baby Doe was confined in the hospital from the moment of birth and remained confined for a period in excess of 31 days after the expiration of MMA's group health insurance contract.

10. During the period of hospital confinement, Baby Doe received substantial health care services, including hospital services, and related products.

11. BCBSKS paid $133,208.17 for costs of medical care services incurred by Baby Doe during the 31–day period of January 1 to January 31, 2000.

II. *Contractual Provisions and Statutes.*

At all times relevant to this suit, K.S.A. § 40–2254 (2000) provided in part:

**Group accident and sickness insurance; extension of payment of benefits.** Every group policy ... providing inpatient hospital, medical-surgical benefits issued or renewed within this state or issued or renewed outside this state covering residents within this state shall:

(a) Contain a provision extending payment of such benefits until discharged or for a period not less than 31 days following the expiration of the policy, whichever is earlier, for covered insureds confined in a hospital on the date of termination; and

(b) Provide that coverage under any subsequent replacement policy, contract or certificate that is intended to afford continuous coverage will commence immediately following expiration of any prior policy, contract or certificate *with respect to benefits not paid or payable under subsection (a).*

[emphasis added].[2]

MMA's group policy, under Part XI, "When Coverage Ends" contained the following provision:

---

1. The court would like to complement counsel for both parties for the straight-forward and professional manner in which they have presented the matter to the court for decision.

2. In 2001, the Kansas legislature amended K.S.A. § 40–2254. Both sides agree that the earlier 2000 version is the relevant provision here, although both sides suggest that the 2001 amendments lend credence to their respective interpretations of the 2000 version. The 2001 amendments changed the statute as follows:

**40–2254. Group accident and sickness insurance; extension of payment of benefits.**

**D. Extension of Benefits When Hospitalized**

If either you or your dependents is hospitalized when coverage is scheduled to end, we will continue coverage, for the patient only, up to 31 days or whenever the hospitalization ends, whichever occurs first. Coverage during these 31 days will be without any premium charge.

Under Part VIII "Coordination of Benefits," the MMA policy provided in part:

If you or someone in your family are covered by this plan and another health plan, the two plans coordinate benefits. * * * The intent is to avoid paying twice on the same service while providing insured individuals with the benefits outlined in this certificate.

To coordinate benefits, one plan (the primary plan) pays benefits first, and the other plan (the secondary plan) pays if there are allowable expenses not paid by the first plan.

*　　*　　*

**B. Determining Which Plan is Primary**

If the other plan has no rules for coordinating benefits, this plan will pay secondary. Otherwise, one of the following rules will apply.

*　　*　　*

*Continuation Coverage*

Every *issuer of a* group policy and certificate of accident and sickness insurance providing inpatient hospital, medical-surgical benefits issued or renewed within this state or issued or renewed outside this state covering residents within this state shall:
(a) ~~Contain~~ *Include in its contracts* a provision extending payment of such benefits until discharged or for a period not less than 31 days following the expiration date of the policy, whichever is earlier, for covered Insureds confined in a hospital on the date of termination; ~~and~~

If a person whose coverage is provided under a right of continuation provided by federal or state law is also covered under another plan, the order of benefits will be determined as follows:

1. First the benefits of a plan covering the person as an employee, member, or subscriber (or as that person's dependent);

2. Second, the benefits under the continuation coverage.

If the other plan does not have the rule described above, and if, as a result, the plans do not agree on the order of benefits, this rule is ignored.

*Length of Coverage*

If none of the above rules determines the order of benefits, the benefits of the plan which covered an employee, member, or subscriber longer is the primary plan.

The BCBSKS plan contained "Continuation Coverage" and "Length of Coverage" clauses substantially identical to the two MMA provisions cited above. These provisions were derived from a model rule on Coordination of Benefits promulgated by the National Association of Insurance Commissioners (NAIC) and adopted by the Kansas Insurance Commissioner in Kan.Admin.Reg. § 40–4–34. The drafting notes accompanying the NAIC provision on Continuation Coverage state in part:

(b) *not fail to enroll in a replacement group policy, contract or certificate without any gap in coverage any individual who is confined to a hospital or otherwise disabled at the time such individual's prior group policy, contract or certificate terminates;*
(c) provide that ~~coverage~~ *payment of benefits* under any subsequent replacement policy, contract or certificate that is intended to afford continuous coverage will commence immediately following expiration of any prior policy, contract or certificate ~~with respect to benefits not paid or payable under subjection (a)~~.

The Consolidated Omnibus Budget Reconciliation Act of 1987 (COBRA) originally provided that coverage under a new group health plan caused the COBRA coverage to end. An amendment passed as part of P.L. 101–239 ... allows the COBRA coverage to continue if the new group plan contains any preexisting condition limitation. In this instance the two group plans will cover an individual, and the rule above will be used to determine which of them assumes the primary position. In addition, some states have continuation provisions comparable to the federal law.

### III. *Summary of Arguments.*

MMA contends that both insurers had coverage for Baby Doe's medical expenses in January 2000, but that BCBSKS' responsibility was primary and MMA's was secondary by virtue of the coordination of benefit (COB) rules in the parties' contracts. MMA notes that K.S.A. § 40–2254 required MMA to extend coverage for 31 days past expiration of the contract. It argues this was "coverage ... provided under a right of continuation provided by federal or state law" within the meaning of the "Continuation Coverage" rule in the contract. Under that rule, according to MMA, the BCBSKS policy was primary because it covered Baby Doe as the dependent of an employee, while the MMA plan was secondary because it provided coverage under a right of continuation provided by state law.

For its part, BCBSKS concedes that it had a duty to enroll Baby Doe as of January 1st, but argues that K.S.A. § 40–2254 (2000) placed responsibility for paying the January health costs on MMA. It notes that subsection (a) of the Kansas statute required MMA to extend payment of benefits for 31 days past expiration, while subsection(b) required BCBSKS to provide coverage immediately after expiration only "with respect to benefits not paid or payable under subsection (a)." According to BCBSKS, this exemption in subsection (b) shows that the Kansas legislature intended to place responsibility for the extended benefits on the issuer of the expiring group policy and not on the issuer of the replacement policy. To construe the "Continuation Coverage" rule otherwise, as MMA urges, would thus contradict the mandate of § 40–2254, BCBSKS argues that § 40–2254 (2000) was incorporated into the policies expressly and by operation of law, and that it supersedes any contrary policy provision. Moreover, MMA's reliance on the "Continuation Coverage" rule is misplaced, BCBSKS contends, because a "right of continuation" is not the same as an "extension of benefits," and the COB rule for continuation coverage was intended to apply only to a true "continuation of benefits"—such as an election of continued coverage under COBRA or analogous state laws.[3] If any COB provision in the contract does apply, BCBSKS maintains, it is the "Length of Coverage" rule, which places primary responsibility for the costs on MMA as the policy providing coverage for a longer period.

**3.** "COBRA" is an acronym for the Consolidated Omnibus Reconciliation Act of 1985. COBRA included a provision giving employees and their covered dependents the right to continue their group health insurance coverage at their own expense following the termination of their employment or some other "qualifying event." Many states (including Kansas) have adopted "little COBRA" laws similar to the federal law. (The change of group insurance carriers in this case was not a "qualifying event" covered by COBRA or similar provisions.). Unlike the extension of benefits at issue in the instant case, continuation of coverage under COBRA occurs only upon an election by the employee, and it requires the employee to pay premiums. *See* 29 U.S.C. § 1161–1168.

In response, MMA contends that BCBSKS' interpretation of § 40–2254 would conflict with federal law, because it would permit a replacement group carrier to discriminate in coverage based on health status (i.e., against a person hospitalized as of the effective date of the policy) by delaying benefits until after the 31–day period. MMA argues such a construction is preempted by 42 U.S.C. § 300gg–1 of the Health Insurance Portability and Accountability Act of 1996 (HIPAA). MMA cites a regulation of the Health Care Financing Administration (HCFA) of the Department of Health and Human Services, which has interpreted § 300gg–1 as prohibiting a succeeding group carrier from failing to provide immediate coverage under similar circumstances. *See* 45 CFR § 146.121(e). MMA also points to legislative history suggesting that in 2001 the Kansas legislature eliminated the exemption in K.S.A. § 40–2254(b) precisely because of concerns that the 2000 version was preempted by HIPAA. BCBSKS, meanwhile, points out that the HCFA issued a memorandum setting forth its view that although state law cannot eliminate the obligation of a succeeding group carrier under HIPAA to *enroll* a hospitalized individual (including one covered under an extension of benefits from a prior carrier), HIPAA does not prevent state law from "promoting better outcomes ... by providing rules for which carrier will actually *make payment* in a particular situation." Thus, federal law places an absolute obligation on the succeeding carrier to enroll the individual for benefits, but state law may provide that another earner has the obligation to pay for the services, *Cf.* 45 CFR § 146.121(e) ("This section does not affect any obligation [a prior carrier] may have under applicable State law to provide any extension of benefits and does not affect any State law governing coordination of benefits."). BCBSKS thus concedes that Baby Doe was enrolled under

its policy as of January 1st, but argues that MMA was obligated to make payment for Baby Doe's health costs in that month.

## IV. *Discussion.*

■ MMA was clearly obligated to provide coverage to Baby Doe for all of January 2000. Although the MMA contract expired at the end of 1999. it provided that "[i]f either you or your dependents is hospitalized when coverage is scheduled to end, we will continue coverage, for the patient only, up to 31 days or whenever the hospitalization ends, whichever occurs first." These conditions were satisfied such that MMA was obligated to provide coverage for 31 days after expiration of the contract. It is also clear that MMA's obligation to provide such coverage was mandated by Kansas law. K.S.A. § 40–2254(a)(2000) required the contract to contain the provision extending payment of benefits.

As for the BCBSKS group contract, which took effect January 1, 2000, it was a replacement contract intended to afford continuous coverage to qualified participants in the employer's health plan. Baby Doe was entitled to be enrolled under the plan, and in fact BCBSKS concedes that Baby Doc was enrolled as of January 1st. Consequently, absent some provision of law or contract stating otherwise, BCBSKS also had an obligation to provide coverage for the January 2000 health costs incurred by Baby Doe.

BCBSKS contends that the unambiguous terms of K.S.A. § 40–2254 (2000) made MMA rather than BCBSKS responsible for paying the January 2000 costs. As noted above, it is true that subsection (a) of that statute required MMA to provide extended coverage for the January 2000 costs. Insofar as BCBSKS' rights and duties are concerned, however, the statute only addressed the question of *when replacement coverage was required*

*to commence.* Subsection (b) stated that replacement coverage had to commence immediately following expiration of the prior policy, but only with respect to benefits not paid or payable under subsection (a). Stated conversely, the replacement carrier was *not* obligated to provide immediate coverage for a hospitalized person receiving an extension of benefits under a prior policy. By its literal terms, then, the statute did not purport to make BCBSKS secondarily responsible for Baby Doe's January 2000 treatment costs. Rather, it suggested that BCBSKS had no obligation to provide coverage for such benefits.

Section 300gg–1 of Title 42, United States Code, part of HIPAA's regulation of employer-sponsored group plans, provides in part that a group health plan may not establish rules for eligibility that discriminate on the basis of the health status of an individual. BCBSKS does not dispute that its group contract is subject to this rule. HHS regulations implementing the provision construe it to mean that an issuer in BCBSKS' position violates the non-discrimination rule by failing to provide coverage to an otherwise eligible individual because the person is covered by a prior insurer under an extension of benefits clause.[4] Neither party here questions the reasonableness of this construction. Thus, HIPAA required BCBSKS to provide immediate coverage for Baby Doe, notwithstanding any state law or contract provision to the contrary. (At the same time, the court recognizes that any state law would be unaffected by HIPAA to the extent it merely coordinated benefits by providing that the replacement carrier's coverage is secondary.)

BCBSKS urges the court to construe K.S.A. § 40–2254(2000) as a coordination of benefits rule that merely determined which of the two insurers had the *primary* duty to pay benefits in this situation:

> The statute represents the Legislature's policy decision to allocate certain costs to the prior insurer as opposed to the succeeding insurer. * * * The statute is itself a rule that coordinates benefits. The Legislature intended it to determine which insurer pays in a succeeding insurance situation. In 2000, the statute prescribed a rule requiring the prior insurer to pay under our facts.

BCBSKS Reply at 6. To reach that result, however, the court would have to ignore the actual language of the statute and draft a new provision that not only imposes liability on a succeeding carrier but declares that liability to be secondary. Such drafting is beyond the realm of statutory construction. As noted above, the statute adopted by the Legislature did not mandate coverage or impose liability of any kind on the succeeding carrier in this

---

4. *See* 45 C.F.R. § 146.121(e)(1):

"Example 2. (i) Facts. In previous years, a group health plan has provided coverage through a group health insurance policy offered by Issuer M. However, for the current year, the plan provides coverage through a group health insurance policy offered by Issuer N. Under Issuer N's policy, items and services provided in connection with the confinement of a dependent to a hospital or other health care institution are not covered if the confinement is covered under an extension of benefits clause from a previous health insurance issuer.

(ii) Conclusion. In this Example 2, Issuer N violates this paragraph (c)(1) because the group health insurance coverage restricts benefits (a rule for eligibility under paragraph (b)(1)) based on whether a dependent is confined to a hospital or other health care institution that is covered under an extension of benefits clause from a previous issuer. This section does not affect any obligation Issuer M may have under applicable State law to provide any extension of benefits and does not affect any State law governing coordination of benefits."

*See also* 29 C.F.R. § 2590.702 (Department of Labor regulation applying same standard).

situation. For that reason, it cannot reasonably be interpreted in the manner suggested by BCBSKS, notwithstanding defendant's claim that such a construction would promote the intent of the Legislature. *See Williamson v. City of Hays,* 275 Kan. 300, 64 P.3d 364 (2003) ("The legislature is presumed to have expressed its intent through the language of the statutory scheme it enacted. When a statute is plain and unambiguous, the court must give effect to the intention of the legislature as expressed, rather than determine what the law should or should not be.").

In sum, the court must reject BCBSKS' argument that § 40–2254(2000) is a coordination of benefits rule. A plain reading of the statute suggests that a succeeding carrier was not obligated to provide coverage to a hospitalized person receiving an extension of benefits from a prior carrier. If applied in that manner, the statute would directly conflict with the non-discrimination rule of 42 U.S.C § 300gg–1 as construed by the agencies responsible for implementing it. Application of the state statute would therefore be preempted to the extent of this conflict, notwithstanding the narrow and "flexible" preemption rule of HIPAA. *See* 42 U.S.C § 300gg–23(a) (HIPAA provisions do not supersede state law requirement on group health coverage "except to the extent that such standard or requirement prevents the application of a requirement of this part.").[5] As such, K.S.A. § 40–2254 (2000) provides no basis for BCBSKS to recover the January 2000 benefits from MMA.

The upshot of the foregoing is that: (1) both insurers had coverage for the January 2000 expenses; and (2) K.S.A. § 40–2254 (2000) did not determine which plan was primary and which was secondary. As a result, the order of benefits must be determined under the rules for Coordination of Benefits (COB) in the policies. "To coordinate benefits, one plan (the primary plan) pays benefits first, and the other plan (the secondary plan) pays if there are allowable expenses not paid by the first plan," *Stipulations, Attachment* 1 at MMA 213. In this case, both policies had essentially the same COB rules, one of which—the "Continuation Coverage" rule—provided that if a person whose coverage is provided "under a right of continuation provided by federal or state law" is also covered under another plan, the plan covering the person as an employee (or dependent) is primary, and the plan providing continuation coverage is secondary.

BCBSKS argues this rule does not apply because MMA's coverage arose under an "extension of benefits" clause, which BCBSKS maintains is distinct from "continuation coverage." The court cannot agree. The meaning of coverage that is "provided under a right of continuation provided by federal or state law" is plain on its face. *See First Financial Ins. Co. v. Bugg,* 265 Kan. 690, 694, 962 P.2d 515, 519 (1998) ("Policies must be construed according to the sense and meaning of the terms used, and if the language is clear and unambiguous, it must be taken in its

---

5. There are conceivable (though less workable) interpretations of K.S.A. § 40–2254 (2000) that would not be inconsistent with HIPAA. For example, the last clause of subsection (b)—dealing with a succeeding carrier's potential duty to provide immediate coverage in an extension of benefits situation—could be read as being permissive only, meaning it does not require the carrier to provide immediate coverage but also does not prohib-

it such coverage or relieve the carrier from its duty to provide coverage by virtue of federal law. So construed the statute would not contradict the requirements of HIPAA. But such an interpretation would not aid BCBSKS, because the statute still would not operate to create secondary coverage on BCBSKS' part, which is an essential element of BCBSKS' position insofar as summary judgment is concerned,

plain, ordinary, and popular sense."). An extension of benefits mandated by K.S.A. § 40–2254(a) following expiration of a group policy falls squarely within the ordinary meaning of the foregoing phrase. It is coverage "provided under a right of continuation" granted by Kansas law. It may be true, as BCBSKS points out, that when the NAIC model rule on "Continuation Coverage" was drafted, the committee had foremost in mind a continuation of coverage under COBRA or analogous state laws, as indicated by the drafting notes accompanying the NAIC rule. But the language adopted in the rule itself (and in the contracts at issue here) is not limited to COBRA-type laws. Given the unambiguous language of the rule, the court cannot say that the rule is limited only to an election of coverage under COBRA or "little COBRA" state laws. Nor is there any evidence in the record that "continuation coverage" and an "extension of benefits" are recognized terms of trade whose technical meaning evinces an intent to exclude the latter from the scope of the "continuation coverage" rule.[6] In sum, the court finds that by virtue of the COB rule for continuation coverage, BCBSKS' plan is primary insofar as the January 2000 health costs are concerned and MMA's plan is secondary. Accordingly, MMA is not liable to reimburse BCBSKS for those costs.

### V. *Conclusion.*

Plaintiff MMA Insurance Company's Motion for Summary Judgment (Doc. 11) is GRANTED. Defendant Blue Cross and Blue Shield of Kansas, Inc.'s Motion for Summary Judgment (Doc. 12) is DENIED.

Plaintiff MMA Insurance Company is entitled to the declaratory relief sought in its complaint. The court finds and declares that defendant Blue Cross and Blue Shield of Kansas, Inc. (BCBSKS) was the primary carrier with respect to $133,208.17 in costs for medical care services incurred by Baby Doe during the thirty-one (31) day period of January 1 to January 31, 2000, and that plaintiff MMA Insurance Company has no liability to defendant BCBSKS for said costs. Defendant BCBSKS shall recover nothing on its counter-claims against MMA and the same are hereby dismissed on the merits. The clerk is directed to enter judgment accordingly.

---

**6.** BCBSKS makes several other arguments in an attempt to show that an "extension of benefits" and "continuation coverage" are categorically different concepts, but its arguments are unavailing. For example, BCBSKS argues that the two concepts are "different in mechanics, function, and purpose," and that "MMA fails to offer a single persuasive reason why the court should treat two dissimilar concepts as similar for the purposes of this case." The single most persuasive factor in determining the scope of the "continuation coverage" rule is the unambiguous language contained therein, which applies to coverage provided under a right of continuation bestowed by law. The extension of benefits provided by MMA is a continuation of coverage bestowed by law. Nothing in the policies or in the nature of COBRA continuation coverage alters that fact or suggests that a contrary' interpretation is preferable.