**EMPLOYERS REINSURANCE CORPORATION, Plaintiff,**

v.

**NEWCAP INSURANCE COMPANY, LTD., Defendant.**

**No. 01–2276–JWL.**

United States District Court, D. Kansas.

July 11, 2002.

---

Robert T. Adams, L. Benjamin Mook, Steven D. Soden, Shük, Hardy & Bacon L.L.P., Kansas City, MO, Brenda G. Hamilton, Shank & Hamilton, Kansas City, MO, David Lee Heinemann, Sharon A. Stallbaumer, Shank & Hamilton, P.C., Kansas City, MO, for Plaintiff.

James S. Kreamer, John P. Patterson, Baker, Sterchi, Cowden & Rice, L.L.C., Kansas City, MO, John S. Worden, Shawn D. Parrish, Jason R. Houghton, Tracy C. Lemmon, Morgenstein & Jubelirer, L.L.P., San Francisco, CA, for Defendant.

## MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

This declaratory judgment action arises out of an insurance coverage dispute between a reinsurer and a reinsured. Specifically, the dispute is over whether an incident at Providence Hospital ("Providence"), which gave rise to a settlement payment of $7,600,000 by Providence to a

third party, is covered by the hospital's commercial general liability ("CGL") coverage provision or its hospital professional liability ("HPL") coverage provision. Plaintiff Employers Reinsurance Corporation ("ERC"), the reinsurer, contends that the settlement falls under the HPL provision while defendant Newcap Insurance Company, Ltd. ("NewCap"), the reinsured, argues that it falls under the CGL provision.[1]

The matter comes before the court on plaintiff ERC's motion for summary judgment. The motion is denied.[2] In short, as a matter of law, the court concludes that the incident at Providence Hospital, which led to a $7,600,000 settlement, is not covered by the HPL provision of the Trust Plan.

## I. STATEMENT OF FACTS

The following facts are uncontroverted unless otherwise noted, or, if controverted, are viewed in a light most favorable to the defendant, the nonmoving party.

The Underlying Action

Providence Hospital, located in Mobile, Alabama, was named as a defendant in a lawsuit filed by Steven R. Florence and Vicki W. Florence, his wife, in the Circuit Court of Mobile County, Alabama. The following are the undisputed facts that gave rise to the lawsuit. Mr. Florence went to Providence's emergency room at approximately 9:47 p.m. on Friday, May 2, 1997. He had been experiencing severe chest pain, shortness of breath and a rapid heartbeat prior to going to the emergency room. His symptoms, however, had abated by the time he was admitted to the emergency room and at 12:30 a.m. on May 3, 1997, he was discharged from the emergency room. After being discharged, he and his wife began walking to their car located in a lower-level emergency room parking lot. While walking in the lower parking lot, Mr. Florence began to experience chest pains again and collapsed a few steps later. After Mr. Florence collapsed, his wife shouted for help. When it appeared no one was coming to help, she ran to the stairs to scream for help several times, while periodically running back to her husband's side.

At 12:34 a.m. security officer Nelson Gene Keller, an employee of Vinson Security working at the hospital, heard someone in the lower parking lot "hollering" for help. Officer Keller testified he first saw Mrs. Florence after she came halfway up the hill, and she told him then that she needed assistance. Mr. Keller radioed his supervisor, Sergeant Maher, and advised him that a person was down in the parking lot. Dwight Grigsby, a Security Supervisor employed by Providence Hospital, first learned of the problem in the lower emergency room parking lot around 12:34 a.m. when he overheard Officer Keller's radio call to the dispatcher reporting a visitor

1. As explained below, which provision provides coverage is significant because the CGL and HPL provisions have different policy limits, and the Umbrella policy for which ERC provided reinsurance is an excess policy that does not attach until the policy limits of the underlying coverage are exhausted. Thus, the allocation of the $7,600,000 settlement between the parties depends on which provision of the underlying insurance plan provides coverage.

2. Also before the court is NewCap's motion for leave to file a second amended answer to ERC's amended complaint. Having carefully reviewed the parties papers and considered the arguments, the court grants the motion to amend. The court notes that even if the motion had not been granted, NewCap's answer to the amended complaint would not have created a genuine issue of material fact for the reasons discussed below in footnote 9. Thus, the determination of the motion to file a second amended answer was of no consequence to the court's ruling on ERC's motion for summary judgment.

"down" in the parking lot. While heading toward Mr. Florence's location, Security Supervisor Grigsby called Sgt. Maher and told him that if the visitor was "down," 911 needed to be called for an ambulance. Officer Keller offered to get a wheelchair for Mr. Florence, but Mrs. Florence informed him they needed a stretcher. After speaking with Mrs. Florence, Officer Keller returned to the emergency room to get a stretcher. On his way to the parking lot where Mr. Florence was down, Sgt. Maher saw Officer Keller about halfway to the parking lot with a stretcher and told him to "hold up" because of the hospital policy of calling 911 for persons down in the parking lot. Mr. Keller complied with Sgt. Maher's order and did not take the stretcher to Mr. Florence's location.

At some point, two security guards arrived at Mr. Florence's location. Mrs. Florence asked the security guards for help, but they replied that "it was against [hospital] policy[,] that they had to call 911" and that the ambulance would be there soon.[3] When Security Supervisor Grigsby arrived at the scene, he checked

Mr. Florence's condition and made the judgment to bring the emergency room staff to Mr. Florence. After about three or four minutes elapsed without the charge nurse arriving, Mr. Grigsby located visiting off-duty nurse Marissa Armentrout, who evaluated Mr. Florence and began administering CPR. Eventually hospital staff arrived at the scene, placed Mr. Florence on a stretcher and took him to the emergency room where he was treated. Mr. Florence arrived in the emergency room at 12:45 a.m. The Florence complaint alleged that as a result of the delay in treatment, Mr. Florence suffered "profound and irreversible brain damage."

The Settlement

On April 27, 1999, Providence settled the underlying lawsuit with the Florences for $7,600,000. On May 4, 1999, Providence's insurance companies entered into an Interim Funding Agreement to fund the settlement. ERC contributed $6,600,000 toward the settlement; the insurance company providing Providence's primary coverage contributed $1,000,000. The Settlement Agreement and Release, dated May 21,

---

3. NewCap continually disputes whether the security guards were motivated by Providence's Person Down Policy or by additional or other reasons, and it contends that it needs additional discovery to resolve the issue. The evidence, however, is clear that the security guards were motivated by the hospital policy; the security guards' depositions leave no room for conjecture on this point. Moreover, to the extent that NewCap is contending that ruling on this summary judgment motion is premature because discovery has not yet been completed, the argument is rejected. Federal Rule of Civil Procedure 56(f) allows a court to stay or deny a summary judgment motion in order to permit further discovery if the nonmovant states by affidavit that it lacks facts necessary to oppose the motion. *Price v. Western Resources, Inc.*, 232 F.3d 779, 783 (10th Cir.2000). The general principle of Rule 56(f) is that "summary judgment [should] be refused where the nonmoving party has not had the opportunity to discover

information that is essential to his opposition." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n. 5, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The protections of Rule 56(f), however, must be invoked and can be applied only if a party satisfies certain requirements. *Id.* These requirements include the filing of an affidavit furnished by the nonmovant explaining why facts precluding summary judgment cannot be presented, identifying the probable facts not available and what steps have been taken to obtain these facts, and explaining how additional time will enable the nonmovant "to rebut the movant's allegations of no genuine issue of fact." *Id.* Instead of filing the required affidavit (or satisfying any other requirement of Rule 56(f)), NewCap simply suggests the need for additional discovery in the body of the memorandum opposing summary judgment. As a matter of law, this unverified assertion does not comply with Rule 56(f) and results in a waiver. *Id.*

1999, documented the terms of the settlement.

### Providence's Person Down Policy

Providence's Policy & Procedures Manual contains a "Person Down Policy." The Person Down Policy requires the security guards to have the hospital dispatcher call 911 to have an ambulance attend to an unconscious person on hospital property, rather than have hospital personnel render assistance. The Person Down Policy was formulated and implemented by Robert Green, Providence's Director of Security and Safety.[4]

### Providence's Insurance Coverage

Providence has both primary and excess insurance coverage. Its primary coverage is provided by a corporation formerly known as the Daughters of Charity National Health Systems ("DCNHS") through the "Amended and Restated" Self–Insurance Trust Plan Document ("the Trust Plan"). The Trust Plan includes both HPL coverage and CGL coverage. DCNHS is the parent corporation of New-Cap. NewCap provides excess liability coverage to DCNHS's member hospitals, including Providence, through Umbrella Liability Policy No. EX001 ("the Umbrella Policy"). The Umbrella Policy provides only excess coverage. Thus, coverage does not apply under the Umbrella Policy until the limits of the Trust Plan are exceeded.

ERC and NewCap entered into a Reinsurance Agreement whereby ERC agreed to reinsure 100 percent of the Umbrella Policy up to a maximum of $35,000,000. The provisions of the Reinsurance Agreement and the Umbrella Policy are such that underlying coverage determinations are governed by the terms of the underlying insurance policy, here, the Trust Plan. The Trust Plan provides $10,000,000 of HPL coverage. Thus, ERC's coverage for HPL claims does not attach until a claim exceeds $10,000,000. By contrast, ERC's coverage for CGL claims attaches when a claim exceeds either $1,000,000 or $5,000,000.[5]

### The Language of the Trust Plan

Part I of the Trust Plan is the CGL Coverage Provision which provides:

Coverage A

---

4. In an attempt to create a genuine issue of material fact, NewCap alleges that the Person Down Policy does not preclude hospital personnel from rendering assistance and, in fact, obligates the dispatcher to alert nursing personnel and "confirm a location where the nursing representatives and security supervisor will meet to be transported to the scene by a security van." Although the language of the policy does comport with NewCap's position, there is no evidence in the record that this was ever an issue in the underlying case. The security guards and Mr. Green, the Head of Security/Safety, uniformly testified at their depositions that the hospital's policy for persons unconscious on the hospital's property was to call 911 to have an ambulance dispatched to the scene. Mr. Green did address the subject of alerting the nursing staff in his deposition and he explained that the van used to transport the nurse and security supervisor is not equipped to transport patients. Thus, that portion of the Person Down Policy was not applicable to the underlying action because neither party suggested that following that part of the policy would have prevented Mr. Florence's brain damage. NewCap fails to provide evidence to the contrary and, accordingly, the court concludes that this fact is not disputed.

5. The parties disagree on when ERC's coverage attaches. The Reinsurance Agreement states the attachment point for CGL claims is $1,000,000 but the Trust Plan originally provided $5,000,000 of CGL coverage. NewCap points out, however, that the Trust Plan was amended on April 19, 1999, to retroactively apply a CGL retention of $1,000,000; therefore, NewCap believes the retention level should be $1,000,000. ERC argues that it should be $5,000,000. The dispute is not relevant to ERC's motion, however. Thus, the court does not address the issue.

I. Bodily Injury Liability Coverage/Property Damage Liability Coverage

The Trust will pay on behalf of the covered persons all sums which the covered persons shall become legally obligated to pay as damages because of bodily injury or property damage to which this coverage applies, caused by an occurrence....

An "occurrence" is defined by the Trust Plan as:

an accident, including continuous or repeated exposure to substantially ... the same general harmful conditions which results in damages covered hereunder which are neither expected nor intended from the standpoint of the covered persons.

Part II of Trust Plan is the HPL Coverage Provision, entitled Professional Liability Coverage, which provides:

Coverage D

I. Professional Liability

The Trust will pay on behalf of covered persons, all sums which covered persons shall become legally obligated to pay as damages because of injury or damage to any person arising out of the rendering or failure to render or errors and omissions [in providing] the following professional services:

Professional service means any act or omission:

a. In the furnishing of professional health care services, such as: medical, surgical, dental or nursing treatment to such person by the covered person inflicting the injury including the furnishing of food, beverages, medications or applications in connection therewith;

b. Handling of or performing post-mortem examinations on human bodies;

c. Arising out of the service by any persons or members of a formal accreditation, standards review, or similar professional board or committee of the covered persons, or a person charged with the duty of executing directives of any such board or committee;

d. Arising out of teaching or instruction in the field of medicine or healthcare; or

e. Arising out of any act, error or omission by the covered persons in the furnishing of services related to the business operations as a managed care organization....

The HPL Coverage Provision of the Trust Plan contains a Miscellaneous Professional Liability Coverage Endorsement ("MPLC Endorsement") which forms a part of the HPL Coverage Provision:

Miscellaneous Professional Liability

It is agreed that as respects professional liability services provided by an employee, authorized volunteers, committee member or any other covered persons in their professional capacity on behalf of any covered persons such as:

- Architect and Engineer
- Attorney
- Accountant
- Real Estate Manager or Agent
- Pastoral Care Provider
- General Contractor
- Third Party Claims Administrator
- Loss Control, Safety or Engineering Representative
- Risk Management Consultant
- Computer and data processing technicians or consultants
- Bio-medical technicians or engineers
- Any other similar miscellaneous professional services related to health care

This Trust shall provide coverage for any act, error or omissions alleged to apply to any covered persons provided such liability arises out of such authorized professional

services in a covered persons' business in the course of their professional services.

Under the definitions in the Trust Plan, Providence, Mr. Green and all of the security guards working at Providence the night of the incident are "covered persons."

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir.2002). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Trust Co. of Kansas v. Abbott Laboratories, Inc.*, 259 F.3d 1226, 1231–32 (10th Cir.2001) (citing *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir.1998)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Adler*, 144 F.3d at 670 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

The court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)(quoting Fed.R.Civ.P. 1).

## III. DISCUSSION

The parties do not dispute that the underlying Florence settlement is covered by the Trust Plan. Instead, the dispute concerns whether the settlement of the Florence lawsuit is more appropriately covered under the HPL or the CGL provision of the Trust Plan.[6]

### A. The Follow the Settlement Doctrine Does Not Apply

■ NewCap urges the court to adopt a deferential review of the underlying facts and ask only whether NewCap made a good faith determination that the underlying Florence claim is covered under the CGL policy. Newcap bases its position on the follow the settlement doctrine, which NewCap alleges modifies the reinsurer's duty to indemnify its reinsured in the reinsurance context. According to NewCap, under the doctrine the court is not permitted to make a de novo review of NewCap's settlement decisions; instead, the reinsurer is required to cover settlement determinations made by their insureds as long as the settlements are not fraudulent, collusive, or made in bad faith. Thus, according to NewCap, where a reinsured settles a case in good faith and the settlement is arguably within the scope of the insurance coverage, the doctrine provides that the settlement is binding on the reinsurer. Citing two district court opinions from other circuits, NewCap argues that the doctrine applies to decisions of how to allocate a settlement between different policies. The court does not believe that the doctrine applies under the facts here.

In this case, DCNHS settled with the plaintiff for $7,600,000, as documented by the Settlement Agreement and Release dated May 21, 1999. ERC contributed $6,600,000 of the settlement amount pursu-

---

6. In addition to the arguments on the merits, NewCap makes a number of evidentiary objections that the court does not reach. Even considering the evidence, ERC's motion for summary judgment is denied.

ant to the Interim Funding Agreement, which was signed on May 7, 1999. The language of the Settlement Agreement is silent as to whether the lawsuit is being settled as a CGL or HPL claim. The Interim Funding Agreement between NewCap, DCNHS and ERC is not silent, however. It states that DCNHS "has requested that [ERC] make a financial contribution towards settlement of the Underlying Action" and also render an opinion as to which policy the claims made in the underlying action are covered under. The agreement goes on to explain that although ERC's opinion is that the claim is covered under the HPL policy, because DCNHS "is a long-standing and valued client of [ERC] and both parties wish to work together in a cooperative spirit to facilitate settlement of the Underlying Action," ERC will contribute $6,600,000 toward the settlement. The agreement adds that the contribution is "without prejudice to any right [ERC] may have to reimbursement of such funds in the event of judicial determination that [ERC] has paid more than required under the terms of the [DCNHS] policy." In short, based on the language of the Interim Funding Agreement, the court concludes that the issue of whether the CGL or HPL policy covered the settlement was never decided by the parties involved.

NewCap's sole evidence to the contrary is a declaration from Gregory Lee, DCNHS's Director of Claims–Risk Management, stating that "[w]hen [he] accepted the terms of th[e] settlement, [he] anticipated that the Florence Claim would be covered by commercial general liability coverage." The court has no doubt that Mr. Lee did anticipate that the Florence Claim would be covered under the CGL provision; however, ERC anticipated that it would be covered under the HPL provision, and when it agreed to contribute $6,600,000 toward the settlement, it made that fact clear in the Interim Funding Agreement. This lawsuit, therefore, seeks to answer the precise question of whether the Florence Claim is covered by the CGL or HPL provision of the Trust Plan, a question that has not previously been answered. Thus, the court concludes that the follow the settlement doctrine is not applicable to the facts here.[7]

## B. Policy Coverage

In assessing whether the underlying settlement is covered under the HPL or CGL policy, the court must interpret the language contained in the insurance policies.

### 1. Rules for Interpreting Insurance Policies

 Under Kansas law,[8] the construction and interpretation of an insurance policy is a question of law to be determined by the court. *First Fin. Ins. Co. v. Bugg*, 265 Kan. 690, 962 P.2d 515, 519 (1998). If the language in the insurance policy is unambiguous, the court cannot remake the contract; it must be enforced as made. *Brumley v. Lee*, 265 Kan. 810, 963 P.2d 1224, 1226 (1998). Unambiguous language is to be "taken in its plain, ordinary, and popular sense." *Bugg*, 962 P.2d at 519.

---

7. In addition to being distinguishable from other follow the settlement doctrine cases because the reinsurer contributed the majority of the money that settled the case, here the interests of the primary insurer, DCNHS, and the reinsured, NewCap, are aligned against the reinsurer, ERC. Thus, unlike the cases NewCap cited, here the reinsurer and reinsured's interests are directly opposed. *See*

*North River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194, 1199 (3d Cir.1995) (explaining that one of the compelling policy reasons for the doctrine is that the interests of the reinsurer and reinsured are "generally identical").

8. The parties have stipulated to the application of Kansas law.

■ "[T]he duty to indemnify is determined by the facts as they are established at trial or as they are finally determined by some other means (*e.g.,* summary judgment or settlement)." *Bankwest v. Fidelity & Deposit Co. of Maryland,* 63 F.3d 974, 978 (10th Cir.1995) (citing *Travelers Ins. Co. v. Waltham Indus. Laboratories Corp.,* 883 F.2d 1092, 1099 (1st Cir.1989)). Here, the underlying lawsuit settled; therefore, the duty to indemnify is determined from the facts forming the basis of the settlement. *American Motorists Ins. Co. v. General Host Corp.,* 946 F.2d 1482, 1489 (10th Cir.1991), *reh'g granted and opinion modified,* 946 F.2d 1489 (10th Cir. 1991) (quoting *Travelers Ins.,* 883 F.2d at 1099; *see also Ogden Corp. v. Travelers Indem. Co.,* 740 F.Supp. 963, 968 (S.D.N.Y. 1990)). Thus, the court must analyze the facts that constituted the basis for the settlement of the Florence lawsuit to determine whether the settlement should be covered by the CGL or HPL provision of the Trust Plan.

## 2. The Facts Forming the Basis of the Settlement

Both parties urge the court to consider the language in the plaintiff's complaint in the underlying action as well as how the parties in the underlying action characterized the lawsuit. While these factors carry some weight and, therefore, the court will address them, the court does not believe they are determinative. Instead, the court must assess the underlying facts as they existed when the claim was settled and make the determination as to whether the incident falls within the coverage of the relevant insurance provisions.

Both parties agree that the settlement agreement and release do not finally establish or determine any facts. Both parties also agree on the underlying facts regarding what happened at Providence between 12:34 a.m. and 12:45 a.m. on May 3. What is in dispute, however, is the motivation for the actions taken by the security guards that night and how the claims were characterized in the subsequent lawsuit against Providence. New-Cap argues that the underlying lawsuit was premised on the theory of security guard negligence and a resulting delay in transporting Mr. Florence to receive medical care while ERC contends that the underlying action was "focuse[d] on the reasonableness of the [hospital's] policy to call 911 in response to individuals 'down' in the parking lot." NewCap argues that because the facts are disputed, genuine issues of material fact exist and summary judgment is inappropriate. The court disagrees that genuine issues of material fact exist; the evidence in the record does not support NewCap's position.

It is clear from the plaintiff's settlement brochure in the underlying case, the Confidential Report of Liability and Damages prepared by Providence's Counsel, the depositions of the security guards and all of the other evidence in the record regarding the underlying case that the lawsuit was focused on the sole issue of whether the hospital's Person Down Policy, which required security guards to call 911 in response to individuals down in the parking lot, was reasonable. In other words, the evidence establishes that the plaintiff's position in the underlying lawsuit at the time of settlement was that Providence's policy of calling 911 and having an ambulance dispatched to the scene when a person was down on hospital property was unreasonable and resulted in a delay in medical care that caused Mr. Florence to suffer brain damage.[9]

---

9. Both parties also rely on portions of the plaintiff's state court complaint in the underlying action to support their positions. Under Kansas law, "[a]lthough the duty to defend is

### 3. HPL Coverage

Having determined that the underlying facts are not in dispute, the court must determine, as a matter of law, whether the facts that formed the basis of the settlement of the Florence lawsuit fit within the terms of the language of the HPL coverage provision. The court concludes that they do not.

The Incident is Not Covered by the HPL Provision

■ The HPL provision unambiguously states that the Trust Plan will pay all damages "arising out of the rendering or failure to render or errors and omissions" in providing the professional services listed. The coverage provision then defines professional services as "any act or omission:"

a. In the furnishing of professional health care services, such as: medical, surgical, dental or nursing treatment to such person by the covered person inflicting the injury including the furnishing of food, beverages, medications or applications in connection therewith.[10]

Based on this language, ERC argues that the security guards' decision to follow the hospital policy of calling 911 to have an ambulance dispatched to the scene instead of placing Mr. Florence on a stretcher and taking him to the emergency room was an omission by the hospital in the furnishing of professional health care services or a failure to render professional services. ERC explains that "[a]bsent the Person Down Policy, the security guards NewCap now blames for Mr. Florence's injuries would have responded to his situation immediately and may have prevented his injuries." ERC concludes that "[b]ecause the Person Down Policy dictated how 'professional health care services' were or were not rendered, this incident is properly covered under the HPL Coverage Provision of the Trust Plan." The court cannot agree.

According to ERC's position, any act taken or policy implemented by a hospital employee (or other covered person) that leads to a delay in a person obtaining medical care is an "act or omission in the furnishing of professional health care services." Here, the security guards' decision to call 911 in compliance with the hospital policy was not an omission in the furnishing of professional health care services. The security guards could not have provided professional health care services; the

determined by the allegations of the underlying complaint and by facts discoverable to the insurer, the duty to indemnify is determined by the facts as they are established at trial or as they are finally determined by some other means (*e.g.*, summary judgment or settlement)." *Bankwest*, 63 F.3d at 978. Thus, the allegations in the underlying complaint are not determinative here. Instead, it is the facts as they existed when the lawsuit was settled, after they had evolved throughout the litigation process, that are determinative. Although the plaintiff's complaint may have initially alleged that the hospital failed to provide adequate treatment, it is clear from the plaintiff's settlement brochure and the Confidential Report of Liability and Damages prepared by Providence's Counsel, both of which were created shortly before the settlement, that the sole issue remaining in the case was

the reasonableness of the hospital's policy of calling 911.

ERC also points out that Providence and DCNHS initially classified the Florence incident as covered by the HPL provisions. While this may have been true, it is clear that DCNHS and NewCap both contacted ERC on May 18, 1999, prior to the settlement, and told ERC that they believed the claim was properly classified under the CGL provision of the Trust Plan. Thus, the court finds the initial classification of the incident of little importance, especially in light of the complex coverage issues this case presents.

10. Although the coverage provision lists four other professional services, both parties agree the only relevant definition is the first one relating to professional health care services.

evidence is undisputed that they were not trained to provide such services.[11] Instead, the Person Down Policy dictated who could transport Mr. Florence to the emergency room, and the security guards' actions in following the Person Down Policy led to a delay in Mr. Florence receiving medical care from other health care professionals who were trained to address his injury.[12]

The court finds this situation analogous to *Jefferson Ins. Co. of New York v. National Union Fire Ins. Co. of Pittsburgh, Pa.*, 42 Mass.App.Ct. 94, 677 N.E.2d 225 (1997), in which the court addressed a coverage dispute for an incident where the alleged negligent conduct was a delay by an ambulance company, called by the local police to respond to a medical emergency, in arriving at the residence of a man who had collapsed with chest pain. *Id.* at 227. In that case, it was undisputed that the delay resulted from miscommunication between the company's radio dispatcher and the ambulance attendants regarding the address to which the ambulance was told to respond. *Id.* In a subsequent coverage dispute, an insurer of the ambulance service sought to deny coverage under a CGL policy because of a "professional services exclusion" which stated that coverage did not apply for "the rendering of or failure to render ... medical ... or nursing services [or] any service or treatment ... of a professional nature." *Id.*

The appellate court agreed, stating that "the negligent conduct complained of [receiving messages from the police, relaying those messages or otherwise supplying ambulances with information necessary for emergency medical technicians to render emergency care, and following the directions] did not constitute professional services." The court explained: "It was rather in the nature of nonspecialized, clerical or administrative activity requiring neither special learning, intellectual skill, nor professional judgment." Significantly, the court there could have found that the negligent conduct resulted in a failure to render medical services that, in turn, caused the man's death, yet it chose not to do that. Instead, it focused on the negligent conduct as being a delay in obtaining medical care caused by miscommunication, which the court concluded was not a failure to render medical services.

Similarly, here the focus should be on the "poorly-conceived" Person Down Policy that resulted in Mr. Florence's injuries. The Person Down Policy was formulated and implemented by Robert Green, Providence's Director of Security and Safety. Much like the miscommunication in *Jefferson Ins. Co. of New York*, which led to a delay in the emergency medical techni-

---

**11.** To the extent that ERC is arguing that the security guards would have obtained a stretcher and transported Mr. Florence to the emergency room, that would not have been the furnishing of professional health care service. *See Marx v. Hartford Acc. & Indem. Co.*, 183 Neb. 12, 157 N.W.2d 870, 871–72 (1968) (explaining that a professional service "is one arising out of a vocation, calling, occupation, or employment involving specialized knowledge, labor, or skill, and the labor or skill involved is predominantly mental or intellectual, rather than physical or manual"). Thus, the court rejects the argument that the Person

Down Policy resulted in the omission of medical care in that respect.

**12.** The court's reasoning is highlighted by a simple alteration in the facts. Suppose a doctor would have been walking by at the exact point in time that Mr. Florence fell to the ground. The "Person Down" policy certainly would not have prevented the doctor from immediately attending to Mr. Florence. Thus, the court disagrees that the policy caused the omission of professional health care services. Instead, it dictated whom security personnel were required to contact to obtain help.

cians arriving, which, in turn, caused the man's death, here the hospital's policy of calling 911 to have an ambulance dispatched led to a delay in Mr. Florence receiving medical treatment, which, in turn, caused his brain damage.

The formulation and implementation of the "poorly conceived" Person Down Policy was an administrative, business decision that applied only to security personnel and does not fit within the coverage of the HPL provision. In support of this position, the court turns to *Guaranty Nat'l Ins. Co. v. North River Ins. Co.*, 909 F.2d 133 (5th Cir.1990). In *Guaranty Nat'l Ins. Co.*, there was a coverage dispute arising out of an incident where a psychiatric patient was placed in an "open" fourth floor room (one without screens over the windows) and jumped through a window to her death. *Id.* at 134. The administrator of the patient's estate sued the hospital for negligence, alleging that the hospital's policy of how to maintain the windows failed to protect the patients. *Id.* In the subsequent coverage dispute, one of the insurers of the hospital refused coverage, arguing that the professional services exclusion in the CGL policy it issued excluded any coverage. *Id.* The Fifth Circuit disagreed, explaining that the "decision to protect the open unit patients through screws in the window saches rather than through fixed, protective screens over the windows was an administrative, business decision and was not a professional, medical decision." *Id.* at 136. Similarly, here Mr. Green's decision to formulate and implement a policy that has security personnel call 911 when a person is down on hospital property is an administrative, business decision.

Having a policy on how to deal with a person down on one's property is hardly unique to a hospital. Although ERC correctly points out that there was no general duty to render aid under the common law, Kansas courts have imposed such a duty in special types of relationships. *See Foster v. Wal–Mart Stores, Inc.*, 2000 WL 554109, *3–4 (D.Kan. April 18, 2000) (explaining that under Kansas law "a possessor of land is under a duty to render first aid to an invitee after knowing or having reason to know of an illness or injury and must provide care until the invitee can be cared for by others"). For example, in *Foster* the court rejected Wal–Mart's argument that it had no duty to render aid after the plaintiff was injured on its property. *Id.* at *5. Thus, any business could find itself faced with a situation in which it had a legal duty to react to a person in distress on its property. Consequently, the Person Down Policy could have been formulated and implemented by Wal–Mart or any other business.

ERC's Cases are Distinguishable

The cases ERC relies on in support of its position are distinguishable from the facts here. In *U.S. Fidelity and Guar. Co. v. U.S. Underwriters Ins. Co.*, 194 A.D.2d 1028, 599 N.Y.S.2d 654 (N.Y.App.Div. 1993), a patient at a hospital fell in his wheelchair from a loading dock onto the pavement below. *Id.* at 1028, 599 N.Y.S.2d 654. After the lawsuit was settled, the insurer brought a declaratory judgment action seeking to have the court declare that it did not have a duty to defend and indemnify the insured for the lawsuit. *Id.* The policy language was nearly identical to the language here. In essence, it provided coverage for professional health care services. *Id.* at 1029, 599 N.Y.S.2d 654. Under that policy, the court concluded the insurer had a duty to defend. *Id.* The court reasoned that the policy covered more than just medical malpractice claims; it also covered claims sounding in negligence which involve the furnishing of professional health care services. *Id.* The court also explained, however, that even if the policy only covered

medical malpractice claims, the incident would be covered because the complaint alleged that the patient who fell had been permitted to roam the halls of the hospital without proper supervision demanded by his condition. *Id.* The court concluded that these allegations infer that the patient's condition was not correctly assessed or that he was not treated and supervised properly in view of his condition, and that constitutes medical malpractice. *Id.*

ERC relies on *United States Fidelity and Guar. Co.* for the proposition that the HPL provision here covers more than just medical malpractice. The court agrees. ERC then states that "[e]nforcing the [Person Down] policy precluded immediate medical assistance to Mr. Florence [and] was a failure to render professional services." Such a proposition does not follow from *United States Fidelity and Guar. Co.* In that case it was clear that the doctors or nurses either misdiagnosed or failed to supervise the patient. Thus, it was unquestionable that professional health care services were being furnished. In short, the court does not believe that implementing a policy concerning how people are to be dealt with if they go down on the property and which leads to a delay in receiving medical care is tantamount to an omission in furnishing professional health care services.

ERC attempts to refute this exact proposition by pointing the court to *Duncanville Diagnostic Center, Inc. v. Atlantic Lloyd's Ins. Co. of Texas*, 875 S.W.2d 788 (Tex.App.—Eastland 1994) and *Harris Methodist Health System v. Employers Reinsurance Corp.*, 1997 WL 446459 (N.D.Tex.1997). In *Duncanville*, the court addressed whether an exclusion contained in a CGL policy which provided that coverage does not apply to bodily injury "due to the rendering or failure to render any

professional service" precluded coverage where a radiological technician administered "a massive overdose of chloral hydrate" to a patient and the employees of the Center failed to obtain a proper medical diagnosis of the overdose when she remained unconscious. *Id.* at 790. The court rejected the argument that the allegedly negligent acts were administrative or ministerial tasks in concluding that the patient's death was "directly attributed to the allegedly negligent providing of professional medical treatment or the failure to provide such treatment." *Id.* The court added that "[t]o the extent the acts involved in this case did not require the exercise of professional medical judgment, the acts were nonetheless an intricate part of the professional medical services provided by the Center...." *Id.*

Similarly, in *Harris Methodist*, the court concluded that coverage existed under a hospital's HPL policy for claims made by patients that had been exposed to Hepatitis C by a surgical scrub technician [13] while being treated at the hospital. 1997 WL 446459, at *1. In *Harris Methodist*, the situation was nearly identical to the one here in that the insurance companies settled the lawsuit brought by the hospital patients, established an Interim Funding Agreement and then turned to the court to determine whether CGL or HPL coverage provisions applied. *Id.* After determining that coverage existed under the HPL provision, the court turned to whether a professional services exclusion in the CGL provision precluded coverage under that provision. Relying on the language in *Duncanville* relating to acts that are "an intricate part of the professional medical services provided," the court concluded that the essence of this case also arises from the failure to render professional medical services; although [the surgical

---

13. The court stated that the parties' papers did not attempt to "explain precisely how the

exposure occurred or exactly what [the surgical scrub's] function was at the hospital...."

scrub] did not directly render medical services, as a surgical scrub technician he was an "intricate part of the professional medical services provided." *Id.* at *4. Thus, the court concluded that the professional services exclusion applied to exclude coverage under the CGL provision.

Relying on the language in *Duncanville,* ERC argues that "[a]lthough the security staff did not render medical care, by enforcing the Person Down Policy they implemented the hospital's policy on how medical services were provided [and][t]o the extent the enforcement of the Person Down Policy did not require the exercise of professional medical judgment, its enforcement by the security staff and the security supervisor was nonetheless an intricate part of the professional services provided by Providence and fall within the HPL coverage."

The court finds the facts in those cases distinguishable. *Harris Methodist* involved a surgical scrub technician who played a direct role in furnishing professional health care services to patients. All of the patients exposed to Hepatitis C were either patients in the hospital or people who were exposed by patients in the hospital and each patient received professional health care services at the hospital. In *Duncanville,* it was two radiological technicians who administered an overdose of chloral hydrate to the patient and employees of the Center who failed to obtain a proper medical diagnosis of the overdose when the patient remained unconscious. The court there stated:

Administering drugs as well as providing medical advice or making a medical diagnosis requires the exercise of trained medical judgment. These acts also demand the application of specialized education and knowledge. Furthermore, the skills involved in rendering these medical services are predominantly intellectual rather than physical.

Clearly, [the patient's] death was a direct result of the rendering of or the failure to render professional medical services.

*Duncanville Diagnostic Center, Inc.,* 875 S.W.2d at 791. Thus, it is clear that like *Harris Methodist,* professional health care services were being furnished when the negligent actions occurred. Moreover, *Duncanville* illustrates what is meant by the omission in the furnishing of health care services. In the course of providing health care services, the radiological technicians failed to diagnose the overdose that caused the patient's death. This was an omission in medical care that is distinct from the delay in receiving medical care caused by the implementation of the Person Down Policy.

ERC nonetheless contends that the court in *Duncanville* included a receptionist who relayed information from the lab technician to the parents of the patient at the Center as a person who played "an intricate part of the professional medical services provided by the Center." Thus, ERC argues that the receptionist is analogous to a security guard who enforces a hospital policy that dictates whom security guards call when patients are down on the hospital property. The court does not agree. First, the court believes that it was the formulation and implementation of the Person Down policy that caused the delay in receiving medical care. The security guards enforcing the policy were not negligent, they were following the hospital's "poorly conceived" policy. Furthermore, assuming the enforcement of the Person Down Policy was the cause of the delay, the security guards enforcement of the policy is not an intricate part of the professional health care services provided by Providence. At the time that the security guards contacted 911, Providence was not furnishing professional health care services to Mr. Florence. Moreover, the policy of calling 911 prevents the security

guards from playing any role in providing professional medical services. Instead, they are instructed to contact the dispatcher who, in turn, is supposed to call 911 and have an ambulance dispatched to the scene. Unlike the receptionist in *Duncanville* who was relaying medical information in the process of providing a patient professional health care services, the security guards were detached from such a setting and their services were limited to "assisting patients and visitors with transportation and/or directions to various departments."

In sum, *Duncanville* and *Harris Methodist* involve situations where professional health care services were being furnished to patients and the negligent actions or omissions of health care employees, who were either providing professional health care services themselves or playing an intricate role in the process, caused the patients to suffer injuries. Here, the cause of Mr. Florence's injuries was not the negligent actions of the security guards, it was the formation and implementation of the Person Down Policy by Mr. Green. Moreover, the facts here are distinguishable. Providence was not furnishing health care services to Mr. Florence at the time he fell in the parking lot. He had been discharged from the hospital and it is undisputed that the plaintiffs' claims did not relate to any previous care provided. Second, the enforcement of the Person Down Policy did not result in an omission in furnishing health care services to Mr. Florence, the policy resulted in a delay in Mr. Florence being transported to the hospital to receive treatment. Finally, the security guards did not and could not play any role in providing professional health

care services. Instead, the facts here are more analogous to the situations in *Jefferson Ins. Co. of New York* and *Guaranty Natl. Ins. Co.* The formulation and implementation of the Person Down Policy led to a delay in Mr. Florence receiving medical care. The negligent act, therefore, was the decision to adopt the policy. Such a decision is an administrative, business decision that is not covered by the HPL provision.

The Parties Arguments in the Underlying Litigation Are Not Determinative

Finally, ERC argues that DCNHS and NewCap's litigation strategy of arguing that the plaintiffs must plead their case under Alabama Code § 6–5–551, a section of the Alabama Medical Liability Act of 1987, "standing alone is enough to bring the [Florence lawsuit] within the scope of the HPL Coverage." The court disagrees.

Alabama Code § 6–5–551 provides: "In any action for injury, damages, or wrongful death, whether in contract or in tort, against a health care provider for breach of the standard of care, whether resulting from acts or omissions in providing health care … the Alabama Medical Liability Act shall govern the parameters of discovery and all aspects of the action." Ala. Code § 6–5–551. DCNHS and NewCap had a strong incentive to try to require the plaintiffs' to comply with Alabama Code § 6–5–551 because that section has stringent pleading requirements that would not otherwise apply to a general negligence case. Such a strategy is not an admission by DCNHS and NewCap that the lawsuit in fact involved an omission in the furnishing of professional health care services. Instead, it was a litigation tactic.[14] More-

---

**14.** In *North River,* the Third Circuit explained that if a reinsurer were allowed to use the arguments of the insured and the reinsured in the underlying litigation against the reinsured, it "would place insurers in the untenable position of advancing defenses in coverage contests that would be used against them by reinsureds seeking to deny coverage." 52 F.3d 1194, 1206 (3d Cir.1995). Additionally, the court explained that the reinsured and the insured party would be required to litigate

over, NewCap communicated to ERC prior to the settlement that NewCap had revised its previous coverage position, and NewCap settled the lawsuit with the understanding that it believed the Florence lawsuit would be covered under the CGL provision.

The court also notes the plaintiffs' reply to DCHNS and NewCap's challenge; he stated that the lawsuit "was not filed under the code statute." He also stated that "this is not a medical claim." Although the plaintiffs had until May 3, 1999, to modify the Underlying Complaint and add a count for medical negligence, they had not done so at the time the case was settled on April 27, 1999. While the plaintiffs had an incentive to avoid the stringent pleading requirements of the Alabama Medical Liability Act, the court nonetheless believes this carries some weight toward showing that the plaintiff did not intend to try the case as a medical negligence case and this fact was clear when the case was settled.

### 4. MPLC Endorsement Coverage

Alternatively, ERC argues that coverage exists under the MPLC Endorsement to the HPL provision. ERC explains that the "delay in providing treatment was directly attributable to the Person Down Policy." The policy was formulated and implemented by Mr. Green. As Director of Security and Safety, Mr. Green is a "covered person" under the terms of the Trust Plan. Mr. Green was responsible for interviewing and selecting security guards that would be used by the hospital and for ensuring that hospital policies were enforced. The security guards were also responsible for enforcement of hospital

policies and for "assisting patients and visitors with transportation and/or directions to various departments." Thus, according to ERC, in responding to Mr. Florence's collapse, the security guards were "providing services ... in their professional capacity on behalf of ... covered persons (i.e., Director Green and Providence Hospital)" and, therefore, coverage exists. The court cannot agree with this reasoning.

The court concludes from the unambiguous language of the endorsement that it is not intended to expand the scope of professional services covered by the HPL provision. Instead, the exclusive purpose of the endorsement is to provide coverage to "employees, authorized volunteers, committee member[s] or any other covered persons in their professional capacity on behalf of any [of the] covered persons listed," provided they are engaged in "professional services." Thus, the rendering of or failure to render "professional services" as defined in the body of the HPL provision of the Trust Plan remains a prerequisite to coverage under the endorsement. Having determined that the uncontroverted facts establish that Mr. Green's formulation and implementation of the Person Down Policy was the cause of Mr. Florence's injuries, and that such action is not a professional service covered by the HPL provision, the court rejects ERC's argument that coverage exists under the MPLC endorsement. Even if the cause of Mr. Florence's injuries was the delay in his receiving medical treatment because of the security guards enforcement of the Person Down Policy, the security guards were not engaged in professional services either. Thus, MPLC coverage does not exist and, accordingly,

---

and settle the underlying case with competing objectives to either maximize or minimize insurance coverage. *Id.* Although *North River* was applying this reasoning to the follow the settlements doctrine and this court has deter-

mined that it does not apply here, the underlying reasoning is applicable. NewCap and DCNHS had different objectives in trying to settle the Florence lawsuit than they do now in this coverage dispute.

ERC's motion for summary judgment is denied.

**IT IS THEREFORE ORDERED BY THE COURT** that plaintiff ERC's motion for summary judgment is denied.